THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MELVIN JONES, Defendant-Appellant.

First District (5th Division)   No. 83—1903

Opinion filed July 2, 1987.

SULLIVAN, P.J., dissenting.

Steven Clark and Barbara Kamm, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, David A. Cuomo, and Bernard J. Murray, Assistant State's Attorneys, of counsel), for the People.

JUSTICE PINCHAM delivered the opinion of the court:

Following a bench trial, defendant, Melvin Jones, was found guilty of the murder of Geoffrey Mayfield, which occurred in Chicago in January 1982. Defendant was adjudged an habitual criminal and was sentenced to imprisonment for natural life. Defendant contends on appeal that the trial court erred: (1) in denying the defendant's motion to quash his December 10, 1982, arrest; (2) in admitting at the hearing on defendant's motion to quash his arrest the testimony of a police officer that a polygraph test was taken by Deneen Murray, who allegedly implicated defendant in an October 19, 1982, triple murder; and (3) in improperly admitting into evidence at trial a police officer's incriminating hearsay conversation with Geoffrey Mayfield, the deceased. The defendant further contends that (4) the evidence failed to establish his guilt beyond a reasonable doubt; (5) the trial court erred in refusing to grant him a new trial on the ground of newly discov-

ered evidence; (6) he did not waive his right against self-incrimination when he was questioned by police officers on December 10, 1982; (7) the Habitual Criminal Act (Ill. Rev. Stat. 1985, ch. 38, par. 33B—1 *et seq.*) is unconstitutional; and (8) he was denied the effective assistance of counsel. The facts out of which these contentions arose follow.

Geoffrey Mayfield's body was found at the rear of his Chicago residence on January 28, 1982. An autopsy revealed that Mayfield died as a result of numerous bullet wounds to the head.

The defendant was arrested by Chicago police officers Robert Flood and Dennis McGuire on February 5, 1982, as a suspect in the January 1982 Mayfield murder. The defendant was not then charged with the Mayfield murder. He was charged, however, with the unlawful use of a weapon, arising out of the alleged discovery of a gun in his possession when Flood and McGuire arrested him. Because of his inability to make bond on the weapons charge, the defendant was held in custody for eight months, from February 5, 1982, the date of his arrest, to September 2, 1982, when he was found not guilty and discharged from custody.

On October 19, 1982, three people were shot and killed in an apartment on the south side of Chicago. Officers Flood and McGuire arrested the defendant on December 10, 1982, as a suspect in this triple murder. The defendant was not charged with the triple murder.

McGuire and Flood contend that the defendant orally confessed to the January 1982 Mayfield murder during their interrogation of him while he was in custody as a suspect in the October 19, 1982, triple murder. The alleged confession was not reduced to writing and the defendant denied that he confessed. The defendant was charged with the January 1982 Mayfield murder.

The defendant filed a pretrial motion to quash his December 10, 1982, arrest and suppress evidence. At the hearing on the motion, Officer Flood testified as a State's witness that the defendant was released from custody on September 2, 1982, on a weapons charge which arose out of his arrest of the defendant as a suspect in the January 1982 Geoffrey Mayfield murder. Flood testified that during his investigation of the October 19, 1982, triple murder, a female by the name of Deneen Murray told him that she, the defendant, and two other named males entered the apartment in which the murders later occurred, that she sat in the kitchen with one of the males while the other male and the defendant conversed with one of the occupants of the apartment in an adjoining room. The defendant left the apartment. He returned a few minutes later carrying a duffel bag and reentered the room adjoining the kitchen. A few moments later she

heard gunshots. Murray and the male in the kitchen with her dived to the floor. When the shooting stopped she and the male in the kitchen left the apartment and returned to the car in which she had arrived with the defendant and the two named males. A few moments later the defendant and one of the named males came down the apartment stairs. Murray saw a gun in the opened duffel bag carried by the defendant. The duffel bag was put in the trunk of the car and they drove to her aunt's house several blocks away. They let her out of the car and told her not to tell anyone what had happened or she and her family would be killed. Flood further testified that Deneen Murray escorted and directed him to the apartment in which the three people had been shot to death and that Murray later took a polygraph examination. Flood additionally testified on direct examination at the hearing on defendant's motion to quash his arrest:

"Q. And that apartment that she [Deneen Murray] led you to, was that the same apartment that these three people were found shot to death on October 19, 1982?

A. Yes, sir.

Q. Now, after Deneen Murray led you to this apartment did you have occasion to take Deneen Murray to anywhere for the purpose of conducting a polygraph examination?

A. Yes, sir.

Q. And where did you take her to?

A. To 1121 South State.

Q. And *did she in fact submit to a polygraph examination* dealing with the story that she related to you?

A. Yes, sir, she did.

Q. What were the results of that polygraph examination?

[Defense counsel]: Objection.

THE COURT: Polygraph results are not admissible.

[Assistant State's Attorney]: Not the results themselves but I think as far as corroborating what this officer was told in fact to justify his actions thereafter.

THE COURT: *Indicate that she did take a polygraph.*

[Assistant State's Attorney]: Q. After you completed this investigation, these interviews with Deneen Murray, did you have occasion to inform anyone else of the results of your interviews and your investigation?

THE WITNESS: A. Yes, sir.

Q. And who did you inform of the results?

A. I informed Detectives Lotito, Bosco, Sergeant Holt, my supervisors, and generally the entire Area 2 Violent Crimes

Unit.

Q. Did you in fact tell them you were looking for anyone in connection with the shooting deaths *** which occurred on October 19, 1982?

A. Yes, sir.

Q. And who did you tell them you were looking for?

A. Melvin Jones also known as Foo Foo." (Emphasis added.)

Not one of the foregoing statements attributed to Deneen Murray by Officer Flood was recorded in any police report prepared by Flood or any other officer, nor was a polygraph test mentioned or referred to in any police report. There was no police report prepared on the conversations between Flood and Deneen Murray, nor was a police report prepared which stated that Flood had any conversation with Murray or that Murray accompanied Flood to the apartment in which the murders occurred, or that she pointed out the apartment to him.

As stated by our supreme court in *People v. Nicholls* (1970), 44 Ill. 2d 533, 539, 256 N.E.2d 818:

"We have consistently held that the results of a polygraphic examination cannot properly be introduced as evidence either of guilt or innocence of an accused. [Citations.] If the results of such a test are inadmissible, then it necessarily follows that *the mere fact that one was given is likewise inadmissible*, for to admit such evidence would only tend to confuse and not enlighten." (Emphasis added.)

In *People v. Eickhoff* (1984), 129 Ill. App. 3d 99, 102-03, 471 N.E.2d 1066, this court definitively stated:

"[T]he language of *Yarbrough* [*People v. Yarbrough* (1982), 93 Ill. 2d 421, 444 N.E.2d 493] precludes reference in a criminal trial to the fact that a polygraph examination was offered to, or refused by, a defendant, as well as whether he passed or failed it.

This view finds additional support in the tenor of several Illinois appellate decisions. In *People v. Rutledge* (1977), 45 Ill. App. 3d 779, 359 N.E.2d 1233, the court considered the rule of *People v. Nicholls* (1970), 45 Ill. 2d 533, 256 N.E.2d 818, and *People v. Zazzetta* (1963), 27 Ill. 2d 302, 189 N.E.2d 260, prohibiting the questioning of a defendant as to whether he *had been offered* a polygraph examination, as equally applicable to the questioning of a defense witness. *People v. York* (1975), 29 Ill. App. 3d 113, 329 N.E.2d 845, held that the trial court erred in permitting testimony that the complaining witnesses in an aggravated incest case *had submitted to polygraph examina-*

*tions* since, though the results of the tests were not admitted, the obvious implication was that had the results been negative, the case would not have been prosecuted." (Emphasis in original.)

In *People v. Thomas* (1984), 123 Ill. App. 3d 857, 867, 463 N.E.2d 832, the court concluded that the use of polygraph evidence in a criminal trial necessarily interfered with the integrity of the judicial fact-finding process and required reversal regardless of the weight of the other evidence which supported the guilty finding.

In the case at bar the State contends that Deneen Murray furnished Flood the information upon which Flood arrested the defendant. The defendant contends that the trial court erred in admitting into evidence on the hearing of defendant's motion to quash his arrest Flood's testimony that Deneen Murray took a polygraph examination on the veracity of her information. In *People v. Haymer* (1987), 154 Ill. App. 3d 760, the arresting officer relied on the results of a polygraph examination in arresting the defendant. The trial court sustained the defendant's motion to suppress his inculpatory statement made after his arrest. The State appealed alleging that the trial court erred in ruling that there was no probable cause for the defendant's arrest. This court affirmed, stating:

"The police requested and Haymer agreed to take a polygraph examination. The examination took place at 9 p.m. that same evening. At about 2:30 or 3 a.m. on October 5, the police told Haymer that the polygraph examiner had said he was lying. When he refused to change his story, the police arrested him. *The police cannot rely on the results of a polygraph examination in making a probable cause determination.* In *People v. Baynes* (1981), 88 Ill. 2d 225, 240, 430 N.E.2d 1070, the Illinois Supreme Court held that the results of a polygraph examination were not admissible in a trial court to prove either guilt or innocence of a defendant because of serious doubts about the reliability and scientific recognition of such tests and the prejudicial effect upon a jury of hearing such results. *People v. Szabo* (1983), 94 Ill. 2d 327, 363, 447 N.E.2d 193 (court may not consider results of a polygraph exam in a sentencing hearing); *People v. Yarbrough* (1982), 93 Ill. 2d 421, 427, 444 N.E.2d 493 (court may not consider results of a polygraph exam in a post-trial motion)." (Emphasis added.) *People v. Haymer* (1987), 154 Ill. App. 3d 760, 768-69.

■ In the instant case Officer Flood's testimony of Murray's polygraph examination was to establish probable cause for the defend-

ant's arrest. The results of the polygraph examination were admitted through subterfuge and innuendo when Officer Flood testified that he informed his supervisor and other officers of the results of the test and then immediately thereafter told them that he was looking for the defendant for the triple murder. The only conclusion to be derived from this testimony was that the test results revealed that Deneen Murray spoke the truth when she told Flood what she had seen and heard, which implicated the defendant in the October 19, 1982, triple murder. Pursuant to the authorities cited, the trial court erred when it admitted Flood's testimony that Deneen Murray had taken a polygraph examination and Officer Flood's testimony which implied that the result of Deneen Murray's polygraph examination was truthful. The defendant is therefore entitled to a new hearing on his motion to quash the arrest.

Upon the trial court's overruling the defendant's motion to quash his arrest, the cause proceeded to trial. The defendant contends that at trial, the court erroneously admitted Officer Kwilos' incriminating hearsay testimony of his conversation with Geoffrey Mayfield in which Mayfield told Kwilos that the defendant was implicated in the December 29, 1981, murder of Charles Brooks. The defendant was not charged with the murder of Charles Brooks.

Officer Roy Kwilos testified that on January 1, 1982, while in a Chicago police station he had a conversation with Geoffrey Mayfield, the person whom the defendant was on trial for allegedly murdering on January 28, 1982. The assistant State's Attorney asked Officer Kwilos:

"Q. And what did Mr. Mayfield tell you at that time concerning the shooting death of Charles Brooks?"

The defendant's attorney objected and the assistant State's Attorney responded:

"Your Honor, we are not offering this for the truth of the matter asserted, simply to explain what the reasons the police officers did the things they did thereafter, in connection with this [the Mayfield murder] case."

■ First, the defendant correctly contends that the officers' explanation of the reasons they "did the things they did thereafter in connection with this [Mayfield murder] case" was irrelevant and immaterial. An explanation for the officers' conduct was not evidence which would prove the defendant's guilt of the crime for which the defendant was on trial. Second, the defendant correctly contends that Kwilos was not in fact being called upon to explain his subsequent conduct in the defendant's case because Kwilos did not do anything

further in the defendant's case, except, according to Kwilos' testimony, unsuccessfully seek to arrest the defendant as a suspect in the Brooks murder, which was also irrelevant and immaterial in the Mayfield murder case on trial. Third, the defense attorney informed the trial judge and the assistant State's Attorney that "we have no difficulties with \*\*\* what steps the police took *after the conversation with Mr. Mayfield.*" (Emphasis added.) Fourth, the defense attorney persisted in his objection to Kwilos' conversation with Mayfield on the grounds that it was prejudicial, inflammatory and inadmissible hearsay. Thereupon, the assistant State's Attorney took inconsistent and diametrically opposite positions in urging the admissibility of the Kwilos-Mayfield hearsay conversation. The assistant State's Attorney stated:

> "*I do not offer this evidence to prove any of the truth of the matters asserted therein.* It's simply that the police talked to Mr. Mayfield, Mr. Mayfield related certain information to the police concerning the incident involving Charles Brooks, and based upon this the police took certain steps and in fact took people into custody.
>
> Whether or not the information which Mr. Mayfield related is true or not is irrelevant. *It does, however, go directly to what we intend to prove is the motive for the defendant here, Melvin Jones, killing Geoffrey Mayfield.*" (Emphasis added.)

The trial judge ruled:

> "These matters will be accepted for the limited purposes indicated by the State, and not for the truth of the matter elicited. That being the case, it isn't hearsay."

The trial judge, however, immediately thereafter conversely ruled:

> "[A]nother possible objection may be raised as to the evidence of other crime, and I will indicate to you as to that issue the reliance has to do with motive and intent; and since this is a state of mind exception, I will allow it to come in."

Based on this ruling Officer Kwilos was permitted to testify that Geoffrey Mayfield told him that he had observed the shooting death of Charles Brooks by Michael Johnson, and that Tyrone Cambric and the defendant, Melvin Jones, were at the scene in an automobile. Mayfield identified Johnson as the person he saw shoot Brooks on December 29, 1981. Kwilos testified further that in reliance on this information from his conversation with Mayfield, he placed stop orders in the Chicago Police Daily Bulletin for the arrest of Melvin Jones, Johnson and Cambric. Kwilos said that he arrested Johnson and looked for but did not apprehend the defendant, Melvin Jones.

The State does not cite any case in its brief as authority for the proposition that the Kwilos-Mayfield hearsay conversation was admissible to establish the defendant's motive to murder Mayfield. In fact, the State concedes, at page 65 in its brief, that the Kwilos-Mayfield hearsay conversation was inadmissible:

> "Defendant's first contention, that officers may not reveal during testimony the substance of hearsay conversations with third parties, is an accurate statement of Illinois law ***. It is established in Illinois that, while testifying about police investigatory procedures, an officer should not reveal the substance of the hearsay conversation with a third party. *People v. Meredith* (1980), 84 Ill. App. 3d 1065, 1077-78, 405 N.E.2d 1306."

In spite of the aforestated contentions urged by the assistant State's Attorney to the trial judge for the admission of and the rulings by the trial judge in admitting the Kwilos-Mayfield hearsay conversation, the State nevertheless unpersuasively and erroneously argued in its brief before this court that "the trial court refused to consider Detective Kwilos' testimony for the truth of the matter asserted."

Although the assistant State's Attorney stated to the trial court that the Kwilos-Mayfield hearsay conversation was not offered "to prove any of the truth of the matter asserted therein," and that the conversation was offered as a predicate for the officer's placing in the Chicago Police Daily Bulletin stop orders for the arrest of Johnson, Cambric and the defendant Melvin Jones, this was not all that the assistant State's Attorney stated. This was not the only basis asserted by him for the admission of the Kwilos-Mayfield hearsay conversation. The assistant State's Attorney also argued the additional ground for its admission that *"[i]t [the Kwilos-Mayfield hearsay conversation] does, however, go directly to what we intend to prove is the motive for the defendant, here, Melvin Jones, killing Geoffrey Mayfield."* (Emphasis added.) This ground asserted by the assistant State's Attorney for the admission of the Kwilos-Mayfield conversation cannot be ignored.

In ruling that it was admissible, the trial judge stated, *"[The Kwilos-Mayfield hearsay conversation] will be accepted for the limited purpose indicated by the State, ***."* (Emphasis added.) One of the *limited purposes indicated by the State* for the admission of the conversation was that "[i]t does, however, go directly to what we intend to prove is the motive for the defendant, here, Melvin Jones, killing Geoffrey Mayfield." Likewise, this ground urged by the prosecutor for admitting the conversation cannot be disregarded.

The trial judge observed that the Kwilos-Mayfield hearsay conversation was not inadmissible because it was evidence of another crime. But, again, this was not all that the trial court stated. The trial judge also said that the Kwilos-Mayfield hearsay conversation "was relevant as to defendant's motive or intent." But, again, the trial judge said more. The trial judge additionally stated (and ruled) that because the conversation established motive and intent, *"I will allow it to come in."* (Emphasis added.) This statement and ruling by the trial judge certainly must be given credence.

The defendant was not required to extract a verbalization from the trial judge that he expressly relied on the Kwilos-Mayfield inadmissible hearsay conversation in determining the defendant's guilt in order to successfully assign admission of the conversation as reversible error. Over the defendant's objection, the assistant State's Attorney persuaded the trial judge to admit the inadmissible conversation as evidence to establish the defendant's motive for the Mayfield murder. It is the assistant State's Attorney who should now be required to establish that the trial judge did not consider or rely on it, rather than impose the burden on the defendant to establish that the trial judge did rely on it. Having succeeded, over the defendant's objection, in admitting the Kwilos-Mayfield hearsay conversation into evidence to prove the defendant's motive for the murder, the assistant State's Attorney cannot now contrarily argue that the trial judge did not consider it.

This court rejected the State's contention in *People v. Fair* (1977), 45 Ill. App. 3d 301, 306, 359 N.E.2d 848, that the trial judge did not consider improperly admitted evidence, a police artist's sketch of the victim's assailant, in finding the defendant guilty of rape and armed robbery. In reversing the defendant's conviction this court held:

> "Nor can we hold admission of the sketch harmless error based upon the presumption that where a case is tried by a court without a jury the court considered only competent evidence in reaching its decision. \*\*\*. In the instant case, the presumption is rebutted by the fact that the trial court admitted the sketch into evidence over the objections of defense counsel. Such actions indicate the trial court's belief that this evidence was in fact competent and, therefore, we cannot presume that the evidence did not enter into the court's consideration of the case."

In the case at bar, in finding the defendant guilty the trial court stated:

> "If the police are telling the truth then the defendant is

guilty beyond a reasonable doubt. There are admissions, and those admissions are corroborated by the statements as to the types of weapons used, the number of shots fired, the place of the crime and *a motive has been established.*" (Emphasis added.)

The trial judge did not state or infer that he relied exclusively on the defendant's admission in finding that "*a motive has been established.*" Nor did the trial judge state or infer that he did not rely on or that he excluded the testimony of the Kwilos-Mayfield inadmissible hearsay conversation in his determination that the defendant was guilty of the Mayfield murder. The dissent's contrary views are pure speculation.

Contrary to the dissent's unwarranted assertion that "it is clear that in his decision the very able trial judge's finding of guilt was based solely on the admissions made by defendant to police officers" (157 Ill. App. 3d at 1033), the trial judge simply stated when he found the defendant guilty that he believed the officers' testimony, which obviously included Officer Kwilos' testimony of the Kwilos-Mayfield inadmissible hearsay conversation.[1] The trial judge did not state or infer that his guilty finding was based solely on the officers' testimony of the defendant's admissions.

Based on the reasons urged by the prosecutor for its admission, the comments made by the trial court when it was admitted and the comments made by the trial court when it found the defendant guilty, occultism is unnecessary. It is clear that the trial court considered the Kwilos-Mayfield inadmissible hearsay conversation. The dissent is in error when it asserts that "the majority *** makes an unwarranted assumption that the trial judge considered the inadmissible testimony of Kwilos" (157 Ill. App. 3d at 1033) in finding defendant guilty, and that the majority is mistaken in its assumption that Kwilos' testimony was considered by the trial judge. Conversely, the dissent concludes, contrary to the record, that the trial judge did not consider the Kwilos-Mayfield inadmissible hearsay conversation.

The contention that the Kwilos-Mayfield hearsay conversation failed to establish the defendant's involvement in the Brooks murder is the opposite contention that was urged by the State to the trial judge and which was accepted by the trial judge in admitting the conversation. In the trial court the State urged that the conversation was admissible to establish the defendant's motive for the Brooks murder

---

[1]The trial judge's complete statement in finding the defendant guilty is attached as an appendix.

and the trial judge agreed. The State cannot now be heard before this court to conversely argue that the conversation did not establish motive or that the trial judge did not consider it to have done so. These inconsistent contentions are unacceptable.

The prejudicial Kwilos-Mayfield hearsay conversation was inadmissible and the trial court erred in admitting it. We therefore reverse and remand for a new trial. See *People v. Meredith* (1980), 84 Ill. App. 3d 1065, 1077, 405 N.E.2d 1306; *People v. Wright* (1974), 56 Ill. 2d 523, 532-33, 309 N.E.2d 537.

■ The defendant further contends that the evidence failed to prove beyond a reasonable doubt that he was guilty of Geoffrey Mayfield's murder and that the State's evidence was improbable, incredible, unsubstantiated and demonstrated a frame of the defendant by Officers McGuire and Flood, about whose credibility the trial court expressed concern. We now address these contentions.

When the defendant was first arrested by Flood and McGuire on February 5, 1982, as a suspect in the January 1982 Mayfield murder, he was represented by attorney Cassandra Watson. He was not charged with the commission of the Mayfield murder. He was, however, charged with the offense of unlawful use of a weapon (Ill. Rev. Stat. 1985, ch. 38, par. 24—1), which allegedly arose out of the arresting officers' discovery of a gun in the defendant's possession when they arrested him. Attorney Watson also represented the defendant on the weapons charge. The defendant was found not guilty on the weapons charge and was released on September 2, 1982, after eight months' confinement awaiting trial on the charge.

At the defendant's trial for the Mayfield murder, attorney Watson was called as a defense witness. Attorney Watson testified that upon becoming the defendant's attorney in February 1982, she advised the defendant that the charge then pending against him was the unlawful use of a weapon. In September 1982 attorney Watson talked to the defendant about the Mayfield homicide and advised him that he was not charged with the Mayfield murder. Attorney Watson testified further that the defendant knew and understood that he was only charged with the weapons offense and that he also knew that he was not charged with the Mayfield murder. Attorney Watson also testified that when the defendant was discharged on the weapons charge on September 2, 1982, "I told him that in my opinion it was obvious the police were going to get him and that they were going to put the [Mayfield] murder case on him any way they could. We had an extended conversation about that [and] I warned him to be very careful."

On October 19, 1982, approximately a month after the defendant's discharge on the weapons charge, the triple murder occurred. Officer Flood testified that he had a conversation with Deneen Murray on November 10, 1982. According to Flood, Murray told him that she accompanied the defendant and two other men, whom she identified by names, to the apartment in which the triple murder occurred. She was in the apartment kitchen adjacent to the room in which the shootings occurred. Murray, the defendant, who had a gun, and the two other men fled the apartment. The defendant and the two men drove Murray from the murder scene to her aunt's home a few blocks away and threatened her and her family with death if she told anyone what had occurred. Flood testified further that Murray accompanied him to and pointed out the apartment in which the triple murder occurred and that Murray took a polygraph examination on the truthfulness of her statements to him and, inferentially, that she passed the polygraph test. Flood testified that he thereafter sought the defendant to arrest him for the triple murder and that he and Officer McGuire arrested the defendant for the triple murder on December 10, 1982.

Officer Flood did not prepare a police report of his conversation with Deneen Murray on November 10, 1982, in which Murray implicated the defendant in the triple murder. No police report existed of Murray's highly probative and incriminating statements of her witnessing a triple murder.

Officer Flood did not obtain a warrant for the defendant's arrest based upon Murray's statements to him. Nor did Flood place a stop order in the Chicago Police Department Bulletin or notify the police department or other law enforcement agencies that the defendant or the other two persons named by Murray were sought for the triple murder, even though Flood had a literal eyewitness to the murders, namely, Deneen Murray.

Officers Flood and McGuire arrested the defendant on December 10, 1982, a month after Murray made the statements to Flood which implicated the defendant in the triple murder. The defendant contends that Flood and McGuire's effort to apprehend him, an alleged triple murderer, during that month-long period was negligible, *i.e.*, they merely sought from the defendant's parole officer the date on which the defendant reported to him.

After the defendant's arrest as a triple murder suspect by Flood and McGuire on December 10, 1982, the defendant was placed in a lineup. Flood and McGuire testified that Deneen Murray identified the defendant in the lineup as one of the persons involved in the October 19, 1982, triple murder. Flood and McGuire also testified on the hear-

ing of the motion to quash that Murray identified the defendant in a lineup.

No police lineup report of the identification of the defendant by Murray was prepared, nor was any other police report prepared which stated that Murray identified the defendant in a lineup as being involved in the triple homicide.

Flood and McGuire testified that shortly after his December 10, 1982, arrest, they informed the defendant after he had been placed in a lineup that he had been identified as being involved in the October 19, 1982, triple murder. This too was not recorded in any police report.

Even though, according to Flood and McGuire, Murray, an eyewitness, had made statements which implicated the defendant in the triple murder and had identified the defendant in a lineup as being involved in the triple murder, the defendant was not charged with the triple murder. No explanation is contained in the record before us for the failure to charge and prosecute the defendant for the triple homicide.

Attorney Watson testified that when the defendant was arrested on December 10, 1982, she had several conversations with him regarding her representing him again but they were unable to make satisfactory financial arrangements. As pointed out, attorney Watson had previously advised the defendant in an extended conversation that he had not been charged with the Mayfield murder and she had warned him to be very careful because "the police were going to get him and that they were going to put the [Mayfield] murder case on him anyway they could."

At trial, Officer McGuire testified, over the defendant's objection, that Deneen Murray told him that the defendant was involved in the triple murder. McGuire further testified that after the defendant's arrest on December 10, 1982, in Officer Bosco's presence, he told the defendant that he had been identified in the lineup as being involved in the triple murder. McGuire stated that he advised the defendant of his *Miranda* rights and that he questioned the defendant about the triple murder. McGuire testified that the defendant told him and Bosco that "he was involved in the Mayfield case and the Brooks case, that he had beat us on the Mayfield case, he had been charged and he knew that he couldn't be charged again for the case." McGuire further testified that the defendant told him and Bosco that he killed Geoffrey Mayfield and that the defendant related to them the intricate factual details of the murder.

The defendant's December 11, 1982, oral confessions to McGuire

and Bosco were not reduced to writing and there was no evidence that the defendant was asked to approve any written synopsis, summary or report of his oral confessions by affixing his signature thereto or by any other means.

Although Officer Michael Bosco testified as a State's witness on June 28, 1983, at the hearing of the defendant's pretrial motion to suppress statements,[2] Bosco was not called as a witness for the State at trial on the following day, or any other date, to corroborate the confessions that McGuire stated the defendant made to him and Bosco. No explanation was offered by the State for not calling Bosco as a witness.

The defendant testified that he knew that he was not charged with the Mayfield murder on February 5, 1982, or during his confinement thereafter to September 2, 1982, when he was found not guilty on the weapons charge. He denied that he told McGuire that he had beaten him on the Mayfield murder and could not be again charged with the Mayfield murder. He denied commission of the Mayfield murder and testified that when McGuire questioned him he denied to McGuire that he committed the murder.

According to the State's trial evidence, after McGuire and Bosco questioned the defendant, Alfred Petrocelli, a felony review assistant State's Attorney, on December 11, 1982, interviewed the defendant in the presence of Officer McGuire. Petrocelli testified that he gave the defendant the *Miranda* admonitions and that the defendant was treated properly. The defendant testified that when he was interviewed by Assistant State's Attorney Petrocelli, he told Petrocelli that he was not involved in the Mayfield murder. The defendant testified further that he also told Petrocelli that he had previously told Officers McGuire and Bosco that he was not involved in the Mayfield murder. The State admits at page 27 of its brief that when the defendant was interviewed by Assistant State's Attorney Petrocelli, "defendant denied participating in either the triple homicide or the Mayfield homicide."

Officer Flood testified that he talked to the defendant on December 12, 1982, which was after the defendant had denied to Petrocelli that he committed the Mayfield murder. Flood stated that after he advised the defendant of his *Miranda* rights the defendant told him that

---

[2]Bosco did not testify at the hearing of the motion to suppress statements that the defendant confessed the Mayfield or Brooks murders. Bosco testified at that hearing that the defendant was given his *Miranda* warning and that he was not mistreated or abused.

he could not again be charged with the Mayfield murder because he had already been arrested, charged and released on that case and that the defendant confessed to and told him the details of the Mayfield murder.

The defendant denied that he told Flood he could not again be charged with the Mayfield murder and denied that he confessed the murder to Flood. Flood, like McGuire, did not reduce the defendant's confession to writing, nor did he have or attempt to have the defendant adopt a summary or synopsis thereof.

The defendant argues that it is highly unbelievable, unlikely, unrealistic, improbable, ludicrous and incredible that he would confess the Mayfield murder to McGuire and Bosco, and immediately thereafter deny commission of the Mayfield murder to Assistant State's Attorney Petrocelli in McGuire's presence, and further state to Petrocelli, also in McGuire's presence, that he told McGuire that he was not involved in the Mayfield murder, and after such denials to Petrocelli and McGuire again confess the Mayfield murder to Flood. The defendant further urges that he knew on September 2, 1982, when he was discharged on the weapons charge that he could be charged with and prosecuted for the Mayfield murder and he therefore would not confess commission of the Mayfield murder under the purported misapprehension stated by Flood and McGuire. The defendant insists that the testimony of his attorney, Cassandra Watson, corroborated him in this regard. The defendant also insists that from his experience in the criminal justice system, he knew he could be charged with the Mayfield murder when he was discharged on the weapons charge on September 2, 1982, and that because of his experience in the criminal justice system he would not have made such a confession to McGuire or Flood.

On the defendant's understanding of the charges against him and the consequences thereof, it is noteworthy that the record reveals that the defendant had a rather extensive history and frequent involvement with Chicago law enforcement officers dating back to 1970. On August 21, 1970, the defendant was arrested and charged with theft and received a year's supervision. On September 22, 1971, the defendant was arrested and charged with trespassing, for which he was sentenced to 50 days in the Cook County Department of Corrections. On November 11, 1971, the defendant was arrested, convicted and sentenced to 60 days in the Cook County Department of Corrections for unlawful use of a weapon. He was arrested on April 23, 1972, as a burglary suspect and was released without being charged. He was arrested on November 12, 1972, for a burglary,

on which he forfeited his bond. He was arrested on March 30, 1973, for disorderly conduct and the November 12, 1972, burglary charge was reinstated. On May 7, 1975, on his guilty plea, the defendant was sentenced to four years' imprisonment for two armed robberies. On May 20, 1975, he was sentenced to one to four years' imprisonment after his guilty plea to possession of a controlled substance. He was also sentenced on that date to one to four years' imprisonment on his guilty plea to robbery. He was paroled on November 16, 1976, and was arrested three times in 1977 for robbery, burglary and armed robbery. On January 19, 1979, he was found guilty of armed robbery and sentenced to seven years' imprisonment. He was paroled from that sentence on May 20, 1981, and arrested again on February 5, 1982, as a suspect in the January 1982 Mayfield murder.

At trial, the defendant not only denied commission of the Mayfield murder, he also denied that he confessed to the murder, and testified to an alibi, in which he was corroborated by the witness Jacqueline Quinn.

The defendant's confessions to Flood and McGuire were uncorroborated. No other evidence was presented which connected the defendant with the Mayfield murder. The State's evidence against the defendant was not strong or overwhelming. Rather, the State's evidence and the defendant's evidence was close and was evenly balanced, *i.e.*, Flood and McGuire's testimony of the defendant's confession against the defendant's denial that he confessed to them. The trial judge expressly recognized this perplexing dichotomy when, in finding the defendant guilty, he stated:

> "This case, like most others, boils down to the issue of credibility. The police have testified as to certain alleged admissions that were made by the defendant, and the defendant denies making any statements, and it is claimed—and I cannot state it any other way—that he is being framed by the police.
>
> * * *
>
> [E]ither he made these statements or he didn't, and either the police are lying—and there is no other way to put it—or they are telling the truth.
>
> While there are a number of questions as to this matter of credibility, there is one that bears very heavily on the issue, and its this.
>
> If the police are lying and they are attempting to convict him with admissions that he did not make, why do they pick the Mayfield murder for the frame, and not the Brooks homi-

cide or the triple homicide? My conclusion is that he was prosecuted for the Mayfield murder because he did make the statements.

There will be a finding of guilty to the offense of murder *** ."

In response to the trial court's guilty finding and the caliber of the evidence on which the guilty finding was predicated, the defendant's attorney stated:

"With your Honor's finding in this matter, ***. If I might make a statement, for the record, though, as to my feelings about the case, and as to my feelings about the finding here—.

I believe that there has been a grave injustice done here. I have never in my life seen police officers bastardize a system as much as they have in this matter. I have never in my life seen police officers abuse their discretion.

*** I believe there are many questions involved here. I believe those liars, police officers Flood and McGuire—they lied from that stand. I believe their conduct was reprehensible. It disgusts me. ***.

[I] would like to say that I think that the entire trial was unfair. I believe the officers were lying, I have no doubt about that. I believe that there are insurmountable questions, ***."

The trial court responded:

"There is no doubt about one thing. I had said it at trial and I will repeat it again; if the police officers are lying, it is their testimony that is going to take away Mr. Jones' freedom for the rest of his natural life. There is no doubt about it.

*** If in fact the officers were lying, it would be my opinion that they have committed a greater crime than any committed by Mr. Jones or anybody else; that they would abuse their office and trust as you suggest ***.

* * *

[I]f there is some error on my part, I am sufficiently confident of the workings of the criminal justice that they will be found on appeal; which is your next avenue."

The defendant urges that the evidence does not establish his guilt beyond a reasonable doubt and that the trial judge's comments indicated that he had doubts about the testimony of Flood and McGuire and the defendant's guilt. In finding the defendant guilty the trial court reasoned that if Flood and McGuire were lying and attempting to convict the defendant on admissions which the defend-

ant did not make, "why [did] they pick the Mayfield murder for the frame, and not *** the triple homicide."

We decline to discuss or decide whether this inquisitorial bootstrapping rationale by the trial judge was a proper evaluation of the evidence, whether it was logical or whether it was a valid basis and consideration upon which to determine if the evidence established the defendant's guilt beyond a reasonable doubt. On the basis of the record and because of the position we take on other issues presented by the defendant, we decline to disturb the trial court's guilty finding, a determination within its province. *People v. Washington* (1984), 125 Ill. App. 3d 109, 113, 465 N.E.2d 666; *People v. Yarbrough* (1977), 67 Ill. 2d 222, 227, 367 N.E.2d 666.

We next address what occurred when the defendant presented to the trial court his motion for a new trial. The new trial motion was based on newly discovered evidence, an affidavit of Deneen Murray. This newly discovered evidence could possibly have minimized or perhaps completely destroyed the already thin and narrow margin between the weight of the State's evidence and the weight of the defendant's evidence. The defendant argues that the trial court erred in denying his motion for a new trial based on the newly discovered evidence. In her affidavit, Deneen Murray denied that she told Officer Flood that the defendant, Melvin Jones, was involved in the October 19, 1982, triple murder, which was Flood's probable cause basis for his December 10, 1982, arrest of the defendant. Again, it is noteworthy that no police report was prepared which mentioned the observations and statements attributed to this witness, Deneen Murray, to the triple homicide.

This court has stated that the standard of review for a motion for a new trial on the ground of newly discovered evidence is that the new evidence must be of such conclusive character that it will probably change the outcome on retrial. (*People v. Carpenter* (1979), 74 Ill. App. 3d 770, 774, 393 N.E.2d 50.) The new evidence must be material to the issue and not merely cumulative, must have been discovered after trial and be of such character that it could not have been discovered prior to trial by the exercise of due diligence. (*People v. Lovitz* (1984), 127 Ill. App. 3d 390, 394, 468 N.E.2d 1010.) Motions for a new trial on the ground of newly discovered evidence are not looked upon with favor by the courts and should always be subjected to the closest scrutiny. (*People v. Martin* (1983), 112 Ill. App. 3d 486, 501, 445 N.E.2d 795.) The question is largely discretionary on the part of the trial court and the exercise of its discretion will not be disturbed on appeal except in the case of

abuse. *People v. Carpenter* (1979), 74 Ill. App. 3d 770, 774, 393 N.E.2d 50.

Deneen Murray's affidavit stated:

> "On November of 1982 I was questioned by Detective Flood and McGuire of Area 2 Violent Crimes concerning a triple homicide. At no time during the question did I tell them that Melvin Jones was involved. I did not know Melvin Jones at that time. The first time I saw him I was in a police station a month or so later. I viewed a line-up but did not pick out Melvin Jones. I did not have any information concerning Melvin Jones' involvement in the triple murder."

Murray's affidavit not only contradicted and refuted Officer Flood's testimony to establish probable cause for the defendant's arrest on the hearing of the defendant's motion to quash his arrest; Murray's affidavit did much more.

Officer Flood testified on the hearing of the defendant's motion to quash his arrest that Deneen Murray told him that (1) she, the defendant Melvin Jones, and two other named men entered the apartment in which the triple murder occurred; (2) she saw the defendant leave the apartment and reenter carrying a duffel bag and enter a room adjoining the kitchen in which she was sitting; (3) shortly thereafter, she heard gunshots; (4) she then saw the defendant and another man go down the stairs from the apartment with the open duffel bag; (5) Murray saw a gun inside the duffel bag; (6) the men warned Murray not to tell anyone what had happened; (7) Murray pointed out to Flood the apartment where the three people had been shot to death; (8) Murray took (and passed) a polygraph examination on the veracity of the matters that she told Officer Flood.

Murray's affidavit stated that in November 1982 she was questioned by Officers Flood and McGuire about a triple murder. On this, Murray and Officer Flood agree. It is reasonable to assume that Murray had some information regarding the triple murder because Murray admitted in her affidavit that she viewed a lineup (which contained the defendant Melvin Jones) apparently to determine if she could identify the triple murder offender or offenders. Furthermore, Murray did not deny in her affidavit that she pointed out to Flood the apartment in which the triple murder occurred and she stated in her affidavit that she "did not have any information concerning Melvin Jones' involvement in the triple murders."

What is of greater significance is that Murray's affidavit swears that (1) during Flood's questioning of her concerning the triple murder, she did not tell Flood that the defendant, Melvin Jones, was in-

volved in the triple murder; (2) she did not know the defendant Melvin Jones in November 1982, when Flood questioned her; (3) she first saw the defendant Melvin Jones in a police station a month or so later; (4) she viewed a lineup (apparently to determine if any person therein was a person that she had seen involved in the triple murder); (5) the defendant Melvin Jones was in the lineup viewed by Murray; (6) Murray recognized the defendant Melvin Jones as being one of the persons in the lineup; (7) Murray did not pick out defendant Melvin Jones as being involved in the triple murder. Murray's affidavit does not expressly deny that she took or passed a polygraph examination on the statements and acts attributed to her by Officer Flood. However, the sworn statements of Murray in her affidavit implicitly contradict and deny that Murray took or passed a polygraph examination on those matters about Melvin Jones which were attributed to her by Officer Flood's testimony.

Although the results of the polygraph examination, if one was given Murray, were inadmissible, the testimony of the polygraph examiner, however, as to what Murray told him in response to his questions during the examination was available and admissible to contradict the contents of Murray's affidavit. This testimony by the polygraph examiner would also have been available to corroborate Flood's testimony that Murray took a polygraph examination. Conversely, the absence or lack of availability of such testimony from a polygraph examiner would refute Flood's testimony. Moreover, Murray could have testified whether she was given a polygraph examination and she could have been readily impeached by the polygraph examiner if her denial was untrue. On the other hand, upon her denial, the absence of such impeachment would substantiate her denial. Moreover, it would appear that some form of police department records or report would have been available to either corroborate or contradict Murray's sworn statement that she viewed a lineup which included the defendant and that she did not identify him in the lineup as being involved in the triple murder.

From the foregoing it appears that Murray's affidavit was unique newly discovered evidence. Her affidavit specifically sets forth assertions which contradict words ostensibly from her own lips, the lips of the very person upon whom the State relied to justify and sustain a critical issue in the case, the constitutional validity of the defendant's arrest. Moreover, at trial the statements and the identification of the defendant as a person involved in the triple murder attributed to Murray were, in part, the premise upon which the State contended the defendant confessed the Mayfield murder.

Either Murray's affidavit was false or Flood and McGuire's testimony regarding Murray on the motion to quash and at trial was false. As the trial court stated in finding the defendant guilty, "either the police are lying—and there is no other way to put it—or they are telling the truth."

The trial judge resolved the conflict between the testimony of Flood and McGuire and the testimony of the defendant, *i.e.*, whether the officers were lying or telling the truth, by finding the defendant guilty. The trial judge, however, did not resolve the conflict between the testimony of Flood and McGuire regarding Murray and Murray's affidavit. The trial judge erroneously rejected the opportunity and responsibility to resolve this conflict.

■ A determination by the trial judge of the truthfulness or falsity of Flood and McGuire's testimony regarding Murray was essential because the State is constitutionally prohibited from knowingly using perjured testimony to obtain a conviction. It is well established that the prosecutor's use or reliance on testimony known to be false is a practice so lacking in fundamental fairness as to deprive an accused of due process of law. (*Napue v. Illinois* (1959), 360 U.S. 264, 269, 3 L. Ed. 2d 1217, 1221, 79 S. Ct. 1173, 1177.) As the supreme court stated in *People v. Martin* (1970), 46 Ill. 2d 565, 567-68, 264 N.E.2d 147:

"And where, as here, the falsity lies in the testimony of a law enforcement officer giving evidence favorable to the prosecution, the *** decisions establish that it matters not that the prosecuting attorney himself does not have knowledge of the falsity, inasmuch as 'the prosecution is charged with the knowledge of its agents including the police.' "

At the defendant's trial for the unlawful sale of narcotics in *Martin*, a police informer's testimony that he was not paid for his services was corroborated by the testimony of the defendant's arresting officer, Thomas Simpson. Martin was convicted and sentenced to 15 to 30 years' imprisonment and his conviction was affirmed on appeal. In a post-conviction petition, Martin alleged that Simpson had testified in other cases that the informer in Martin's case had been occasionally paid for his services from a contingency fund. The trial judge dismissed the post-conviction petition. The supreme court reversed, held that due process is denied a convicted defendant where the falsity occurs in a State witness' testimony going to the credibility of a witness and stated, *"To put it bluntly one of the officers must have testified falsely, and if it was Simpson there was a denial of due process which would entitle defendant to a*

*new trial."* (Emphasis added.) *People v. Martin* (1970), 46 Ill. 2d 565, 568, 264 N.E.2d 147.

In *People v. Cornille* (1983), 95 Ill. 2d 497, 448 N.E.2d 857, at the defendant's trial for arson Dennis Michaelson testified as an expert prosecution witness that the fire was of an incendiary origin. The defendant was convicted. He filed a post-conviction petition in which he alleged that Michaelson's testimony of his credentials and qualifications as an expert witness was false and that the defendant therefore "was substantially denied due process guaranteed him in the Fourteenth Amendment of the Constitution of the United States and in Article 1, Section 2, of the Constitution of the State of Illinois." (95 Ill. 2d 497, 505-06, 448 N.E.2d 857.) The trial court denied the post-conviction petition. The appellate court affirmed in an unpublished Rule 23 order. (102 Ill. App. 3d 1209.) The supreme court granted leave to appeal and concluded that the false testimony violated the defendant's right to due process of law guaranteed under both the State and Federal constitutions. In reviewing Cornille's conviction and remanding the cause for a new trial, the court stated:

> " 'Perjury is the mortal enemy of justice' [citation], and it has long been recognized that the deprivation of an individual's liberty based upon false testimony is contrary to fundamental principles of fairness in a civilized society [citations]. Every major civil and common law jurisdiction has provided some means of redress for persons unjustly convicted on false testimony. *** 'The government of a strong and free nation does not need convictions based upon such testimony.' [Citations.]
>
> * * *
>
> *** '[T]he truth seeking function of the trial is corrupted by *** perjury whether encouraged by the prosecutor or occurring without his knowledge ***.' " 95 Ill. 2d 497, 508-11, 448 N.E.2d 857.

In *People v. Cihlar* (1986), 111 Ill. 2d 212, 489 N.E.2d 859, the defendant was convicted of rape, burglary and home invasion. The appellate court affirmed. (106 Ill. App. 3d 824.) Thereafter the defendant filed a petition for a new trial under the Post-Conviction Hearing Act (Ill. Rev. Stat. 1981, ch. 38, par. 122—1 *et seq.*) and a motion for relief under section 72 of the Civil Practice Act (now section 2—1401 of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 2—1401)). Both were dismissed by the trial court without an evidentiary hearing. The post-conviction petition and motion alleged that a neighbor of the rape victim would testify that the vic-

tim told her a few days after the rape that her assailant wore a pair of panties over his head that covered his face. This was in direct conflict with the victim's testimony that her assailant wore the panties as a hairnet which did not cover his face, thus enabling the victim to identify the defendant in a lineup and in court as her assailant. In affirming the appellate court, which reversed the trial court's dismissal order (*People v. Cihlar* (1984), 125 Ill. App. 3d 204, 465 N.E.2d 625), the supreme court pointed out, "[a]s we observed in *Cornille*, it has been long recognized that the deprivation of an individual's liberty based upon false testimony is contrary to fundamental principles of fairness in a civilized society." The court further stated:

"If there has been perjurious testimony at trial its falsity need not have been known personally by the prosecutor in order for there to have been a knowing use and a constitutional violation.

This court in *People v. Martin* (1970), 46 Ill. 2d 565, 567, stated: '[I]t matters not that the prosecuting attorney himself does not have knowledge of the falsity, inasmuch as "the prosecution is charged with the knowledge of its agents including the police." ' " *People v. Cihlar* (1986), 111 Ill. 2d 212, 219, 489 N.E.2d 859.

A post-trial evidentiary hearing to determine whether to grant a new trial based on the newly discovered evidence would have been appropriate. At that hearing, the affiant, Deneen Murray, and other witnesses could have been questioned and corroborative and rebuttal evidence could have been presented. The trial court could then have determined whether the newly discovered evidence presented a genuine and substantial factual question, leaving the weight of the newly discovered evidence for consideration at a new trial should the trial court conclude that a new trial was warranted.

Deneen Murray was not a witness newly created by the defense. Her affidavit was not for the purpose of attempting to corroborate the defense or to exonerate or exculpate the defendant in the Mayfield murder. Deneen Murray was initially injected into the Mayfield murder case by Officers Flood and McGuire. Her affidavit denied the statements attributed to her by Flood, which implicated the defendant in the triple murder. Her affidavit further denied that she identified the defendant in a lineup as being involved in the triple murder. Nothing in the record before us explains why the defendant was not charged with and prosecuted for the triple murder if Murray in fact told Flood and McGuire those things about the defendant

which they attributed to her.

The defendants insists that the answer to the trial court's inquiry why the triple murder was not "pick[ed]" as a charge to be brought against the defendant, instead of the Mayfield murder, may be found in the possibility that Deneen Murray did not tell the officers about the defendant's involvement in the triple murder which the officers attributed to her and that Deneen Murray did not identify the defendant in a lineup as a person who was involved in the triple murder.

When presenting Murray's affidavit in support of the defendant's motion for a new trial, the defense counsel stated to the court, "[T]here is no mention anywhere of Miss Deneen Murray in any police reports or discoverable material. The first time that name came into our knowledge was from the stand from Flood and McGuire. That was the only time." The defense attorney further advised the trial court that Murray was "someone we never heard of before; someone we did not know where she was, what the basis of her involvement in this case was—not until the last moment; until midway through the pretrial motions in this matter." Defense counsel finally informed the trial court that he subsequently found Murray "in the county jail after some searching."

Stating that the criteria had not been met for a new trial based on newly discovered evidence and that "[he] would indicate that this is essentially impeachment testimony," the trial judge denied the motion for a new trial.

■ No suggestion is made that Murray's affidavit was fraudulent or that it was not conclusive and could not likely have changed the result upon retrial. Murray's affidavit was material and it was not cumulative. The information was discovered after trial. Confronted with the defense attorney's representations, the trial court did not find that the newly discovered evidence had not been discovered before trial because of any lack of diligence by the defendant's attorney. (*People v. Martin* (1983), 112 Ill. App. 3d 486, 501, 445 N.E.2d 795.) The evidence in this case was closely balanced. A new trial with the newly discovered evidence would have opened avenues and made available the previously mentioned additional corroborative or contradictory evidence for the State or the defendant. For the reasons stated, the trial court erred in denying the defendant a new trial.

In spite of his disrespect for the law, as evidenced by his criminal record, the defendant was entitled to the rules of law. Despicable as he may be, he should not be imprisoned for his natural life on

the trial record before us.

Because we reverse the defendant's conviction and remand the cause for a new hearing on his motion to quash his arrest and suppress evidence and for a new trial, we decline to decide or discuss the other issues raised by the defendant.

Reversed and remanded.

MURRAY, J.*, concurs.

APPENDIX

"THE COURT: Thank you, gentlemen. This case, like most others boils down to the issue of credibility. The police have testified as to certain alleged admissions that were made by the defendant, and the defendant denies making any statements. And it is claimed—And I cannot state it any other way—That he is being framed by the police.

If the police are telling the truth then the defendant is guilty beyond a reasonable doubt. There are admissions, and those admissions are corroborated by the statements as to the types of weapons used, the number of shots fired, the place of the crime and a motive has been established.

And the Court has judged the credibility of defense witnesses and the police in the same way. The defendant has a motive to lie obviously. He faces going to jail for a long time. And the police have a motive to lie. They feel that he beat them. They may be out to get him. There is no need to judge the credibility of Miss Quinn simply because of her lack knowledge as to the whereabouts for great periods of time.

Certain questions have been raised that are relevant to this issue of credibility. Did McGuire know how many shots were fired, and what bullets were recovered before or after these alleged statements? What did the defendant believe, or what was he told about double jeopardy?

Some of those questions are obviously double-edged; for example, regarding the February 5, 1982 arrest. The defendant says that there was no charges of murder and therefore there was no thought of double jeopardy. It was a UUW and everybody knew it, period.

---

*Justice Mejda heard the oral argument in this case and following his retirement Justice Murray was substituted, listened to the tapes of the oral argument and read the brief and record.

That has a bearing as to his state of mind, but it also has a bearing as to the motive for the police to lie. If all that it was was a UUW, why do the cops want to put a false charge on someone who beat a UUW; those are rather common.

Some of the issues that are raised are collateral; as an example, what Mr. Jones told Judge Moran as to his address. Certainly that is impeachment, if at all, to a collateral issue and is not of concern to this court.

There are many questions that were asked that have a bearing on credibility, and I will not overburden this record as to what they are. There is not essential determination to be made. Either he made these statements or he didn't. And either the police are lying—And there is no other way to put it—Or they are telling the truth.

While there are a number of questions as to this matter of credibility, there is one that bears very heavily on the issue; and its this: If the police are lying and they are attempting to convict him with admissions that he did not make, why do they pick the Mayfield murder for the frame, and not the Brooks homicide or the triple homicide? My conclusion is that he was prosecuted by the Mayfield murder because he did make the statements.

Therefore there will be a finding of guilty to the offense of murder in the manner and form as charged in Counts 1 and 2, and there will be judgment entered to that finding.

The defendant is in custody, he has not made bond."

PRESIDING JUSTICE SULLIVAN, dissenting:

The majority has reversed and remanded for a new trial on its conclusion that the trial judge committed prejudicial error because he considered certain testimony of police officer Kwilos in finding defendant guilty. I disagree. This testimony concerned the substance of a conversation Kwilos had on January 1, 1982, with Geoffrey Mayfield, for whose murder on January 28, 1982, defendant was found guilty.

Initially it is noted that the very lengthy discussion by the majority regarding the inadmissibility of this testimony is unnecessary because, as pointed out by the majority in its opinion, the State agrees that it was inadmissible hearsay which should not have been admitted. Moreover, the majority reverses not on the basis that Kwilos' testimony was admitted but because of its conclusion that the trial judge considered the testimony in his finding of guilt. Thus, the simple questions presented on appeal are whether the trial court did

consider this testimony and, if so, whether it was prejudicial error to do so.

It is unquestioned that in the trial judge's decision finding defendant guilty there is no mention by him, directly or indirectly, of Kwilos' testimony and although it is clear that in his decision the very able trial judge's finding of guilt was based solely on the admissions made by defendant to police officers,[3] the majority nevertheless disregards all the references by the trial judge to those admissions, and makes an unwarranted assumption that the trial judge considered the inadmissible testimony of Kwilos. However, in order to reverse, the majority needed to make another unwarranted assumption; namely, that it was prejudicial error to have considered that testimony because it "established that Mayfield implicated the defendant Jones in Brooks' murder, the motive for defendant to kill Mayfield—to avoid apprehension, prosecution and punishment therefor."

In his decision the trial judge does not mention the name of Kwilos or his testimony, but the majority attempts to justify its assumption that he considered this testimony from a portion of his decision which is set forth in its opinion as follows:

"If the police are telling the truth then the defendant is guilty beyond a reasonable doubt. There are admissions, and those admissions are corroborated by the statements as to the types of weapons used, the number of shots fired, the place of the crime and *a motive has been established*." (Emphasis added by the majority.) 157 Ill. App. 3d at 1015.

Relying solely upon the underlined portion of the quote together with comments by the prosecutor and the trial judge when the testimony of Kwilos was admitted, the majority makes the assumption that the judge relied on the Kwilos-Mayfield inadmissible hearsay conversation in his finding that "a motive has been established." However, in this quote and throughout his lengthy decision, the trial judge refers only to the admissions of defendant to the police with no mention whatsoever of either Kwilos' testimony or of the comments made by the prosecutor concerning it.

What the majority avoids seeing is that the motive mentioned by the trial judge in the above underlined portion of his decision is clearly shown in those admissions of defendant. Officer McGuire testified that defendant admitted that he and Cambria had killed May-

---

[3]The complete finding of the trial court is attached as an appendix to the majority opinion.

field "because he was going to testify against a man by the name of Michael Johnson, also known as Dice, in the homicide of Charles Brooks" and Officer Flood testified that defendant admitted to him that he had told Officer McGuire that he and Cambria had shot Johnson.

The majority, however, in order to reverse defendant's conviction completely disregards this testimony and accepts the testimony of defendant that he did not make such an admission to the police. The majority provides no support for concluding, contrary to the trial judge's finding, that defendant was more credible than the police officer.

That this admission by defendant to Officer McGuire was unquestionably the basis for the trial judge's statement in his decision that "a motive has been established" should be obvious in any fair reading of the record, not only because neither Kwilos' name or his testimony was mentioned by the trial judge in his decision but also because there is absolutely nothing in the record even remotely indicating to the trial judge that defendant had knowledge of what Mayfield said to Kwilos or that defendant even knew that Mayfield had talked to Kwilos. With defendant not knowing what Mayfield said it is almost beyond belief that the majority finds Mayfield's statement as motive for defendant to kill him.

Moreover, and most significantly, there is nothing in Mayfield's statement which could provide such a motive. Kwilos testified that Mayfield said "he had observed the shooting [of Brooks] and that an individual known to him as Dice, Michael Johnson, had actually done the shooting and that there were two other individuals in an auto by the scene, and one individual was Tyrone Cambria and the other individual was known to him as Foo Foo, Melvin Jones." The majority does not even attempt to explain, even if defendant knew of it, how Mayfield's simple statement that defendant was in an auto by the scene of the Brooks shooting provides a motive for defendant to kill Mayfield.

Furthermore, in a bench trial there is a presumption that the trial court considered only competent evidence—a presumption that can be overcome only where the record affirmatively shows the contrary. (*People v. Gilbert* (1977), 68 Ill. 2d 252, 369 N.E.2d 849.) There was thus a presumption here that the inadmissible testimony of Kwilos in question was not considered by the trial judge and the majority does not find that it was overcome and it could not, because as pointed out above, the trial judge's finding of guilt was clearly based on defendant's admissions to the police with no indica-

tion whatsoever that any portion of Kwilos' testimony was considered in that determination.

From its unwarranted assumption that the trial judge considered the Kwilos testimony, the majority in order to reverse defendant's conviction needed to make a second assumption, also unwarranted, that it was prejudicial error for him to have considered the testimony because it implicated defendant in the Brooks murder. Kwilos testified that Mayfield told him of seeing Johnson shoot Brooks "and that there were two other individuals in an auto at the scene, and one individual was Tyrone Cambria, and the other individual was known to him as Foo Foo, Melvin Jones [defendant here]." The majority reverses the conviction here by finding that the consideration of this testimony was reversible error because it "established that Mayfield implicated the defendant Jones in the Brooks murder, the motive to kill Mayfield—to avoid apprehension, prosecution and punishment therefor." It is difficult to understand how the majority could possibly reach such a conclusion, not only because nowhere in the record does it appear that defendant had any knowledge that Mayfield had said anything to Officer Kwilos, but also because there is nothing in the statement itself implicating defendant in any manner, directly or indirectly, in the Brooks shooting. Mayfield said only that defendant was present in a car by the scene with no indication whatever that either defendant or the car or its other occupant were in any way involved in the occurrence.

Additionally, the finding of the majority that the consideration of Kwilos' testimony was prejudicial error because it "implicated defendant in the Brooks murder," makes no sense in the light of defendant's obviously incriminating admission to the police that he and Cambria shot Mayfield to keep him from testifying against Johnson in the Brooks homicide. Even assuming the trial court considered the statement of Mayfield to Kwilos in his finding of guilt, it would be harmless error beyond a reasonable doubt in view of defendant's own admission as to his guilt. See *Parker v. Randolph* (1979), 442 U.S. 62, 60 L. Ed. 2d 713, 99 S. Ct. 2132; *Brown v. United States* (1973), 411 U.S. 223, 36 L. Ed. 2d 208, 93 S. Ct. 1565; *Schneble v. Florida* (1972), 405 U.S. 427, 31 L. Ed. 2d 340, 92 S. Ct. 1056.

The majority has also directed on remand that there be a new hearing on defendant's motion to quash his arrest and to suppress evidence because of the affidavit of Deneen Murray presented in support of his motion for a new trial. It appears that information in the affidavit was not available at the time of the hearing and that it

negated certain testimony given by a police officer at the hearing on the motion to quash.

I agree that such a rehearing is required but since there was no prejudicial error in the admission of Officer Kwilos' trial testimony and because the majority has made no other finding of error, its direction of a new trial is inappropriate. Thus I believe that the procedure in *People v. Holiday* (1970), 47 Ill. 2d 300, 265 N.E.2d 634, should be followed and, accordingly, I would vacate the judgment and remand with directions that the court conduct a new hearing on the motion to quash and suppress and to reinstate the judgment if the motion is denied but to grant a new trial if the motion is allowed.