THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LORENZO FORD *et al.*, Defendants-Appellants.

First District (1st Division)   No. 85—3087

Opinion filed November 16, 1987.—Rehearing denied December 17, 1987.

Patricia Unsinn, of State Appellate Defender's Office, of Chicago, for appellants.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Bonnie Meyer Sloan, and Dennis M. Foley, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'CONNOR delivered the opinion of the court:

Following a jury trial, defendants Lorenzo Ford and DeWayne Clemons were found guilty of murder and sentenced to 35 years in the Illinois Department of Corrections. On appeal, the defendants raise the following issues: (1) whether their rights under the sixth and fourteenth amendments were violated by the trial court's refusal to instruct the jury regarding voluntary and involuntary manslaughter; (2) whether they were denied a fair trial by the trial court's failure to require the jury to return verdicts as to the offense of voluntary manslaughter; (3) whether defendants' right to a fair trial was violated by the admission of rebuttal testimony that defendant Ford had been involved in a prior unprovoked stabbing; and (4) whether the trial court abused its discretion in sentencing defendants to 35 years.

Evidence presented at trial indicated that the victim, 18-year-old Roscoe Jenkins, died as the result of a stab wound to his lung and heart. Krystal Warren, Jenkins' former girlfriend and the mother of his child, testified that she had met defendant Clemons and his friend Steve at a party on February 23, 1985. Clemons and Steve were visiting Warren at her apartment the next day when Jenkins arrived to visit the child.

Shortly thereafter, Warren, Clemons and Steve left the apartment and took an elevator down to the lobby. Jenkins, who was in the lobby, pulled Warren off of the elevator by her hair and asked what she was doing with Clemons and Steve. Jenkins slapped Warren and then punched Steve in the face. Warren, Clemons and Steve then went back up to Warren's apartment.

At 10:30 that night, Warren, Clemons and Steve left the apartment to go to a party at 59th and Damen. At 69th and Ashland, Warren and Clemons left the bus while Steve stayed on the bus. Clemons then went into a liquor store where he met his friend, defendant Ford, whom he introduced to Warren. Clemons told Ford he would see him later and Clemons and Warren then left.

By the time they arrived at the party, at 11:15 p.m., it had already ended. Clemons and Warren then boarded a bus at 59th and Ashland and found that defendant Ford was also on the bus. Clemons told Ford that Roscoe Jenkins had hit Steve in the face earlier that evening. Warren testified that Ford had a black-handled knife in his hand with a five-inch blade he kept opening and closing. Ford,

Clemons and Warren first went to Warren's apartment and then walked around the neighborhood.

Clemons then suggested that they go to his cousin's house at 1433 Hastings. Warren testified that Roscoe Jenkins was dating a girl who also lived at that address. When they arrived at 1433 West Hastings, Jenkins pushed open the door, looked at Ford and Clemons and took a step toward Clemons. Clemons then hit Jenkins in the jaw with his fist, grabbed Jenkins' legs and threw him to the ground. Warren went into the lobby of the building and then turned around to watch what was happening. She testified that she saw Clemons holding on to Jenkins' arms so that he could not get away and Ford making jabbing motions with his knife, but that she did not actually see Ford strike Jenkins with the knife. Jenkins finally broke loose and ran away with both Ford and Clemons in pursuit. They gave up the chase when Jenkins ran into a building at 1520 West Hastings.

After Ford and Clemons returned from chasing Jenkins, Ford wiped blood off of the knife with Jenkins' hat. Warren testified that both Ford and Clemons were laughing and that Ford had stated that he knew what he was doing when he stabbed Jenkins.

Chicago police officer Carolyn Burauer testified that on February 25, 1985, at 2 a.m., she and a partner responded to a call and found Roscoe Jenkins lying in the hallway of a building located at 1520 West Hastings. A forensic pathologist testified that Jenkins' death was the result of a single stab wound which pierced his lung and heart and that he had also sustained small incised wounds on his fingers which she characterized as defensive wounds.

During the evening of February 25, 1985, the police went to the home of Krystal Warren. Clemons was there when the police arrived and had previously told Warren to say nothing about what had happened except that Jenkins had slapped Steve.

Clemons and Warren then went to the police station, where Clemons told Chicago police detective James Antonacci about Ford's involvement in the stabbing of Jenkins. Ford was subsequently arrested. After both defendants were apprised of their *Miranda* rights, they gave statements to the police.

Clemons' statement described the incident involving Jenkins' hitting his friend Steve, the fact that he described that incident to Ford and that Ford displayed his recently sharpened knife and said that he was ready to use it. Clemons said that when he saw Jenkins coming out of the building later that night, Jenkins tried to hit him. He stated that he blocked the punch and then "body slammed" Jenkins to the ground. He also stated that he was holding Jenkins on the

ground when Ford came over and stabbed him.

In his statement to Detective Dorich, defendant Ford stated that when he met Clemons and Warren on the bus, Clemons described the punching incident and said that he wanted to go back to the area where the incident had occurred to look for Jenkins. Ford asked to go along and the three spent about an hour walking around the neighborhood. According to Ford, when Jenkins came out of the door of the apartment building he asked Clemons if Clemons was looking for him. Ford said that Clemons then went after Jenkins and hit him. Clemons then tried to pull Jenkins to the ground but Jenkins fell on top of Clemons. Ford stated that he had his knife drawn and he stabbed Jenkins as he tried to get up. After cleaning his knife with Jenkins' hat, Ford and Clemons boarded a bus and Ford left his knife on the bus.

At trial, Ford testified that he had a small pocketknife which he carried for protection. He stated that he was told about the fight with Steve but did not know him and only said that it was too bad. He put his knife in his glove when they got off the bus because Clemons had told him the neighborhood was dangerous. He denied that he and Clemons had had a conversation about the fight or that they were looking for Jenkins.

He testified that when they reached the door of the apartment building at 1433 West Hastings, the door opened and almost hit him. As he jumped back, Jenkins jumped in his face. Jenkins then went over to Clemons, said "[W]hat are you punks doing around here?" and grabbed Warren. Jenkins and Clemons swung at each other at the same time and Clemons hit Jenkins. Jenkins rushed Clemons and Clemons tried to grab him but fell with Jenkins on top of him. Ford then pulled out his knife, as he was afraid when he saw blood coming down Clemons' head. He admitted cutting Jenkins with the knife because he thought both he and Clemons would get hurt. Ford stated that he did not know that Jenkins was cut seriously and that Jenkins kept coming at him so he kept swinging at Jenkins with the knife to keep him away. Ford denied that he and Clemons were laughing after the incident and denied telling the police that he wanted to "get" Jenkins or that Clemons had held Jenkins while Ford stabbed him.

During cross-examination, Ford stated that he had stabbed Jenkins to get him off of Clemons and to defend himself and that he left his knife on the bus because he was scared and because he had "never cut anybody before." He was then asked if he had ever stabbed anyone before, and he stated that he had not. He denied that he had told Krystal Warren that he stabbed a person the night prior

to the stabbing incident at hand. During rebuttal, Warren testified that while she was on the bus with Clemons and Ford on February 24, 1985, Ford stated that "he had stabbed a Puerto Rican guy" the day before the stabbing of Roscoe Jenkins occurred. She also testified that Ford said he pushed the individual he had previously stabbed off the bus after he stabbed him.

Following closing argument and jury instructions, each defendant was found guilty of murder. On September 18, 1985, defendants' sentencing hearing was held. In aggravation, the prosecutor stressed the fact that defendant Clemons previously had been convicted of aggravated assault and unlawful use of a weapon and that he was on probation when he committed the present offense. The prosecution also pointed out that defendant Ford's presentence investigation report indicated that he was a member of the Black Gangster Disciples street gang and that he used marijuana regularly. The prosecutor emphasized that defendants were walking around the projects for over an hour in hope of finding Roscoe Jenkins. The prosecutor then requested that a long term prison sentence be imposed in this case to deter others from committing similar crimes. In mitigation, defense counsel pointed out that defendant Ford was 19 years old at the time of trial and that defendant Clemons was also a young man. Counsel also stated that both defendants had histories of employment and asked the court to impose 20-year sentences, since both defendants had the potential to be rehabilitated. The trial court then sentenced each defendant to 35 years' imprisonment for murdering Roscoe Jenkins. This appeal followed.

■ The jury was instructed on "unreasonable belief" voluntary manslaughter and on self-defense. Defendants contend that the trial court erred by failing to also instruct the jury on both "provocation" voluntary manslaughter and on involuntary manslaughter based on their allegedly reckless conduct. As neither of these issues was raised with specificity in their motion for a new trial, defendants have waived these issues on appeal. (*People v. Adams* (1985), 109 Ill. 2d 102, 116, 485 N.E.2d 339, *cert. denied* (1986), 475 U.S. 1088, 89 L. Ed. 2d 730, 106 S. Ct. 1476.) Assuming, *arguendo*, that the issues had been preserved for appeal, we believe that the evidence presented at trial did not support either theory and therefore the trial court properly denied defendants' request for these instructions.

■ A "provocation" voluntary manslaughter instruction is warranted where the evidence indicates that the defendant acted as a result of sudden and intense passion resulting from provocation. (*People v. Slaughter* (1980), 84 Ill. App. 3d 1103, 1109, 405 N.E.2d 1295;

*People v. Johnson* (1972), 4 Ill. App. 3d 249, 252, 280 N.E.2d 764.) A defendant's testimony that he acted in self-defense does not negate his right to a manslaughter/provocation instruction. (*People v. Pietryzk* (1987), 153 Ill. App. 3d 428, 436, 505 N.E.2d 1228.) However, the right to such an instruction is still dependent upon testimony in the record.

■ Although Ford did testify that he was afraid, neither his actions nor his testimony reflect any of the emotions, such as rage, anger, hatred, resentment or terror, which would entitle him to a provocation instruction. (Ill. Ann. Stat., ch. 38, par. 9—2, Committee Comments at 392-94 (Smith-Hurd 1979).) He testified that he watched Clemons and Jenkins fight for about a minute, that Jenkins got on top of Clemons, and that he (Ford) then stabbed Jenkins because he believed Jenkins was going to hurt both Clemons and him. There was nothing in his testimony to indicate that he acted under sudden and intense passion due to provocation.

■ Although defendants correctly state that mutual combat or quarrel constitutes provocation sufficient to reduce an offense to voluntary manslaughter (*People v. Leonard* (1980), 83 Ill. 2d 411, 420, 415 N.E.2d 358), the facts in the instant case do not support an instruction based on mutual combat. Mutual combat was defined by the court in *People v. Neal* (1983), 112 Ill. App. 3d 964, 967, 446 N.E.2d 270, citing *People v. Matthews* (1974), 21 Ill. App. 3d 249, 253, 314 N.E.2d 15, as follows:

> "Mutual combat is a fight or struggle which both parties enter willingly or in which two persons, upon a sudden quarrel, and in hot blood, mutually fight upon equal terms and death results from the combat." 112 Ill. App. 3d at 967.

■ According to his own testimony, defendant Ford was not involved in mutual combat with Jenkins, nor was the fight on equal terms. Jenkins was unarmed and Ford was armed with a knife which he swung at Jenkins while Jenkins was allegedly being held down by Clemons. Even assuming that Jenkins' attack on Clemons might constitute provocation as to Ford, where a defendant on slight provocation attacks a victim with violence that is out of proportion to the provocation, the mutual combat aspect of provocation does not apply as a matter of law. See *People v. Castiglione* (1986), 150 Ill. App. 3d 459, 467-68, 501 N.E.2d 923, *appeal denied* (1987), 114 Ill. 2d 548; *People v. Matthews* (1974), 21 Ill. App. 3d 249, 252-53, 314 N.E.2d 15.

Defendant cites *People v. Rice* (1933), 351 Ill. 604, 606, 184 N.E. 894, for the proposition that provocation sufficient to reduce a charge to manslaughter may be engendered by harm caused to a third party.

*Rice* is distinguishable in that the provocation in that case resulted from the striking of a young child by an adult who was killed by the child's father after the man threatened to hit the child again. There was, in addition, evidence of a heated quarrel between the two men subsequent to the first incident. The factual situation here is more similar to that in *People v. Castiglione* (1986), 150 Ill. App. 3d 459, 501 N.E.2d 923, *appeal denied* (1987), 114 Ill. 2d 548, in which the court found the mutual combat doctrine inapplicable where two defendants entered a quarrel and stabbed an unarmed victim 16 times. Although Ford stabbed Jenkins only once, the attack nonetheless constitutes violence out of proportion to any alleged provocation.

■ We also find no merit to defendants' contention that the trial court improperly denied their request for an involuntary manslaughter instruction. In order to warrant such an instruction, there must be some evidence of "reckless" conduct. (Ill. Rev. Stat. 1985, ch. 38, par. 9—3(a); *People v. Bowen* (1980), 87 Ill. App. 3d 221, 227, 408 N.E.2d 993, *appeal denied* (1980), 81 Ill. 2d 603.) Recklessness is defined by section 4—6 of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 4—6) as follows:

> "A person is reckless *** when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation."

At issue, then, is whether the record contains any evidence of acts by defendant Ford which, if believed by the jury, could reasonably be concluded to be reckless conduct within the above definition, and those acts caused the death of Roscoe Jenkins.

Defendant relies on *People v. Jenkins* (1975), 30 Ill. App. 3d 1034, 333 N.E.2d 497, *appeal denied* (1975), 61 Ill. 2d 599, in which the court found that it was error to refuse an involuntary manslaughter instruction. The defendant in *Jenkins* was involved in a scuffle with his wife when the victim interceded. The defendant had been holding a paring knife in his hand, and when the victim interceded, he grabbed the defendant by his upper arms. The defendant broke away from the victim and again went after his wife. In the brief struggle with the defendant, the victim was fatally stabbed. Based on the defendant's testimony that he did not remember stabbing the victim and that he was holding the knife on his wife in order to force her to talk to him, the appellate court concluded that a jury could have found the defendant guilty of either murder or of involuntary man-

slaughter based on reckless conduct. 30 Ill. App. 3d at 1040.

The record in the instant case does not, in our view, support a similar conclusion. Krystal Warren's testimony indicated that defendant Ford's actions were intentional and his own testimony was that he stabbed Jenkins because Jenkins was hurting Clemons and that he thought Jenkins would hurt him also. Ford's testimony was clear that he was acting intentionally in self-defense and thus we find no error in the trial court's refusal to instruct the jury on involuntary manslaughter.

The jury was given three forms of verdict: guilty of murder, guilty of manslaughter and not guilty. The jury returned a single verdict finding defendants guilty of murder. Defendants now maintain that their right to due process was denied when the trial court failed to require the jury to return verdicts on the voluntary manslaughter charge. Their position is that a verdict finding them guilty of murder cannot be construed as a finding by the jury that defendants did not subjectively believe they were acting in self-defense. The State's position is that in returning the verdict finding defendants guilty of murder, the jury impliedly found that defendants did not subjectively believe that their actions were justified.

■ Although Illinois Pattern Jury Instructions, Criminal, Nos. 26.01 and 27.01 (2d ed. 1981) recommend that separate guilty and not guilty verdict forms be submitted to the jury on both murder and voluntary manslaughter, under Illinois case law the trial court was under no obligation to give a not guilty form of verdict for each charge. (*People v. Lewis* (1977), 51 Ill. App. 3d 109, 117, 366 N.E.2d 446.) We also note that although the jury here was presented with only three verdict forms, the defendants did not object to the proposed verdict forms nor did they request that any additional forms be given. They have waived the issue for purposes of appeal.

■ Even assuming the issue had not been waived, we do not believe that the omission was erroneous. The same issue was recently raised in *People v. Phillips* (1987), 159 Ill. App. 3d 142, 512 N.E.2d 734, with the distinction in *Phillips* that the defense counsel's request for separate not guilty verdict forms for both murder and involuntary manslaughter had been denied by the trial court. The appellate court noted that while Illinois case law supports the denial of the request for separate not guilty verdicts, the better practice would have been to require a finding on each verdict. (*People v. Phillips* (1987), 159 Ill. App. 3d 142, 149, 512 N.E.2d 734; see also *People v. Washington* (1984), 127 Ill. App. 3d 365, 468 N.E.2d 1285, *appeal denied* (1984), 101 Ill. 2d 586.) While we agree with the court in *Phillips* that a sep-

arate finding on each verdict is a better practice, the failure of the trial court *sua sponte* to require a separate verdict here did not constitute error.

■ Defendants next contend that they were denied a fair trial because the State was allowed to present evidence that defendant Ford had been involved in a stabbing incident the day before stabbing Jenkins. Defendants characterize the testimony as improper and prejudicial "other crimes" evidence. Although defendants have waived their right to raise this allegation on review by failing to raise the issue in a written motion for a new trial (*People v. Pickett* (1973), 54 Ill. 2d 280, 282, 296 N.E.2d 856), we have considered their argument and find it meritless.

Prior to trial, the trial court had sustained a defense motion *in limine* to bar use of Krystal Warren's statement regarding a previous stabbing incident involving defendant Ford. On direct examination Ford testified that he had stabbed Jenkins with his knife and then got on a bus to go home. When defense counsel asked what he did with the knife, he stated that he left it on the bus because he was scared. He then added: "I ain't never really cut nobody before."

During cross-examination, Ford again stated that he left his knife on the bus because he was scared. The following colloquy then took place:

"PROSECUTOR: If you didn't think you had hurt him badly, Mr. Ford, then why were you scared?

FORD: Because I never cut anybody before. I was sick from what happened this night.

PROSECUTOR: You never cut anybody before?

FORD: No."

The trial court then permitted Warren to testify on rebuttal that Ford told her he had stabbed a Puerto Rican the day before and pushed him off the back of the bus.

The prosecution generally has the right to cross-examine a defendant concerning matters raised in his direct testimony in an attempt to explain, modify, discredit, or contradict the defendant's direct testimony. (*People v. Miller* (1976), 39 Ill. App. 3d 714, 717, 349 N.E.2d 103.) When a defendant chooses to testify in his own behalf, he places his credibility in issue, and when he introduces an issue on direct examination, though collateral to the issue to be proved, his statement may be attacked both on cross-examination and through rebuttal witnesses. *People v. Buckner* (1984), 121 Ill. App. 3d 391, 399, 459 N.E.2d 1102, *appeal denied* (1984), 101 Ill. 2d 548; *People v. Clark* (1977), 55 Ill. App. 3d 379, 391, 370 N.E.2d 1111, *cert. denied*

(1978), 439 U.S. 858, 58 L. Ed. 2d 165, 99 S. Ct. 173.

■■ By choosing to testify, Ford put his credibility in issue. Moreover, by offering a self-serving statement that he had never cut anyone before, by repeating the statement on cross-examination, and by denying that he had ever told Krystal Warren about stabbing someone, he opened the door to rebuttal evidence on that issue.

In our view, Krystal Warren's testimony was properly admitted for the limited purpose of impeaching Ford's trial testimony that he had never told Warren about previously stabbing anyone.

In light of our determination that Warren's statement was properly admissible in rebuttal, we also find no error in the trial court's limiting instructions to the jury. The trial court instructed the jury:

> "The believability of a witness may be challenged by evidence that on some former occasion he made a statement that was not consistent with his testimony in this case. Evidence of this kind may be considered by you only for the purpose of deciding the weight to be given the testimony you heard from the witness in this courtroom."

Defendants' argument that the trial court erred in failing to instruct the jury regarding "other crimes" evidence is misplaced. The rebuttal testimony was offered solely for impeachment and not for substantive purposes and therefore there was no need for the trial court to instruct the jury with respect to the issue of other crimes evidence.

■■ Defendants raise the issue that although Warren's testimony was purportedly offered only for impeachment, the State made substantive use of the evidence to the jury by characterizing the knife used by Ford to kill Jenkins as the same knife he had used the day before. Although the prosecutor did make one statement in closing argument to that effect, the error was harmless in light of the overwhelming evidence against defendants. In addition, the jury was instructed that opening and closing arguments are not evidence and that they should disregard any statement made which was not supported by the evidence. It is presumed that a jury will heed the judge's instructions with regard to improper comments and any harm that may have occurred is thereby cured. *People v. Therriault* (1976), 42 Ill. App. 3d 876, 889, 356 N.E.2d 999, *appeal denied* (1977), 65 Ill. 2d 579.

■■ ■ Defendants' final argument is that their 35-year sentences were too harsh in light of their age and their rehabilitative potential.

A trial court's decision with respect to sentencing is entitled to great deference. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 492-93,

431 N.E.2d 344.) Absent an abuse of discretion by the trial court, a sentence may not be altered on review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 156, 368 N.E.2d 882.) This is based on the trial court's superior position from which to consider such factors as the defendants' credibility, demeanor, general moral character, mentality, social environment, habits and age. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882.) An additional and extremely important factor is the serious nature of defendants' crime. *People v. Morgan* (1974), 59 Ill. 2d 276, 282, 319 N.E.2d 764.

The defendants here were convicted of murder and the evidence indicates that they had a preconceived plan to do so. After the attack they displayed no remorse and there was testimony that they were laughing while wiping the knife blade on the victim's hat. At the time of the incident, defendant Clemons was on probation for a conviction on aggravated assault and unlawful use of weapons. Defendant Ford stabbed the unarmed victim through the heart while the victim was being held by Clemons. Ford's presentence report also indicated that he was a member of the Black Gangster Disciples street gang. In mitigation, the court considered that both defendants were young and both had a history of employment.

In imposing sentence, the trial court stated that defendants had murdered a very young man and that he believed the lengthy sentence was necessary as a deterrent. Because the trial court considered the necessary factors with respect to aggravation and mitigation and because defendants' sentences are within the statutory range for the offense of murder (see Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(a)), we find no reason to disturb the sentences.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

In addition, pursuant to *People to Nicholls* (1978), 71 Ill. 2d 166, 374 N.E.2d 194, and *People v. Agnew* (1985), 105 Ill. 2d 275, 473 N.E.2d 1319, we assess defendants $75 in costs for the State's defense of the instant appeal and hereby incorporate it as part of this judgment.

Judgment affirmed.

QUINLAN, P.J., and BUCKLEY, J., concur.