THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SHERRY WHITERS, Defendant-Appellant.

First District (1st Division)   No. 1—87—2644

Opinion filed September 28, 1990.

Randolph N. Stone, Public Defender, of Chicago (Alison Edwards, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, Gael

O'Brien, and Kenneth W. Goff, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'CONNOR delivered the opinion of the court:

Sherry Whiters was charged with murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(2)) and convicted of voluntary manslaughter for the stabbing death of Cecil Barker. Whiters and Barker sporadically lived together for nine months. However, they apparently dated others during this period.

At trial, Shirley Hargrove testified that she had lived with Barker for approximately six to seven years. Specifically, she testified that on February 13, 1987, one day before his death, Barker visited her to discuss that she was seeing another man. During Barker's visit, an argument ensued and Barker slapped her in the face, hurting her mildly. Subsequently, Barker was arrested and charged with battery.

Whiters testified that she went to the police station the next day, February 14, to help get Barker released. But as she was entering the station, Barker was leaving. They rode a bus together to Whiters' apartment. While on the bus, Barker allegedly told Whiters what had occurred the night before. When the defense attorney asked what Barker said on the bus, the assistant State's Attorney objected, and the court sustained the objection on the grounds that it was hearsay. The defense attorney made an offer of proof outside the jury's presence, and Whiters testified that Barker told her that he "beat that bitch's [Hargrove's] ass and that he was hitting her with his fist and kicking her in her stomach and in her pussy." She also testified that Barker said that he "pistol whipped her [Hargrove]—trying to kick her pussy out."

It is uncontested that Barker spent that night in Whiters' apartment and left the morning of February 15. Later, Barker returned to Whiters' apartment between 2 and 3 p.m. Between 3 and 4 p.m., Whiters' aunt, Erma Allen, arrived. Sometime after 4 p.m., Barker and Whiters argued and fought intermittently for the next four hours. At one point, Barker approached Whiters and asked her to dance. When Whiters refused, Barker tried to put his arms around her, and she pushed him away. This activity continued for about 20 to 30 minutes. Later, Whiters went to her bedroom to change clothes because she was going to walk Erma Allen home and planned to meet another man.

Subsequently, Barker followed Whiters into her bedroom and they argued about Whiters walking Erma Allen home. During the argument, Barker allegedly forced Whiters onto the bed, held both of her hands over her head with one hand, used his other hand to remove her pants, and forcibly had sexual intercourse with her. However, in Whiters' post-

arrest statement to Assistant State's Attorney Cuomo, Whiters stated that the intercourse was consensual. While Whiters was in the bedroom, the phone rang. When Whiters attempted to answer the phone, which was located in the kitchen, Barker allegedly pulled the phone off the wall. Then, Barker and Whiters began to argue again, and Barker allegedly pushed Whiters against the washing machine and bent over her as he choked her. Whiters was apparently able to push him off and told him to leave. When Barker reached the front door, he dropped a bag that contained his belongings, approached Whiters in the kitchen, and started arguing with her again. He allegedly grabbed her arm and twisted it behind her back. Whiters then apparently broke loose, and Barker said that "he was going to kick her ass." Then, Whiters grabbed a knife, pointed it towards Barker, and told him to go home. As Barker moved towards Whiters, she stabbed him in the abdomen. Whiters caught Barker before he fell to the floor, and said, "[O]h, my God, I didn't mean it." Then, Whiters ran to call an ambulance. Barker died several hours later. Whiters alleged that she stabbed Barker in self-defense.

Officer Coffman testified that he questioned Whiters at the police station after the stabbing. The officer testified that Whiters said that "Barker pushed her around, grabbed her by the arm and pulled her around the apartment; that [t]hey were in the kitchen; [s]he picked up a kitchen knife, she held it out towards him and he got stabbed." Additionally, the officer noticed that Whiters' skin on her arm was discolored and that there were not any other visible marks. At the police station, Whiters also gave Assistant State's Attorney Cuomo a statement, wherein she stated that the sexual intercourse with Barker was voluntary and that, as Barker came towards her during an argument, she grabbed a knife and stuck it into Barker's abdomen.

Also at trial, Erma Allen testified that she had been at Whiters' apartment since about 3 p.m.; that Whiters and Barker argued while she was there; that she saw Barker trying to pull Whiters' pants off in Whiters' bedroom; that Barker "snapped" the phone; that when Barker packed his clothes in a bag, he dropped it at the front door, approached Whiters, started arguing with her again, and twisted Whiters' arm; and that Whiters' said "she didn't mean it."

During the State's case in chief, Barker's mother testified that they had a "very good relationship," and Barker's stepfather testified that he had an "okay" relationship with Barker. The State continued to question Barker's stepfather, as stated below:

> "Q. Did you ever have any trouble with him [Barker] of an extraordinary nature?

DEFENSE ATTORNEY: Objection.

ASSISTANT STATE'S ATTORNEY: His character has been put into the trial. He can't testify himself. He's dead.

THE COURT: Objection overruled based upon issues placed in the trial in opening statements. You may answer, sir.

Q. What kind of son was he? How did you get along with him?

A. We got along okay.

Q. Did you have any extraordinary difficulties with him, anything out of the ordinary?

A. No.

DEFENSE ATTORNEY: Objection.

THE COURT: Overruled."

When the State cross-examined Hargrove, she testified that Barker was a loving person; and Barker's employer testified that Barker was a good employee.

In rebuttal, the State's questions to Barker's employer were as follows:

"Q. Sir, during that period of two years that Mr. Barker worked for you did you ever see or hear of any complaint whatsoever as to violence on his part?

DEFENSE ATTORNEY: Objection.

THE COURT: Overruled. You may answer.

A. No, none whatsoever.

Q. During that two year period, sir, did you ever hear any complaint about him misusing a weapon that he used in the course of his employment?

DEFENSE ATTORNEY: Objection.

THE COURT: Objection overruled. He may answer.

A. Definitely not.

Q. During that two-year period, sir, did you ever see Mr. Barker drunk?

A. Nope.

Q. During that two-year period, sir, did you ever receive any complaints from anyone that he was intoxicated while working?

A. No, no, I didn't.

DEFENSE ATTORNEY: Objection.

THE COURT: Overruled."

The jury found Whiters guilty of voluntary manslaughter. Whiters appeals.

■ Initially, Whiters argues that the trial court erred in refusing to instruct the jury on involuntary manslaughter because if the jury be-

lieved Whiters' testimony that she grabbed the knife only to fend off Barker, rather than intending to kill him, the jury could have concluded that picking up the knife during a domestic quarrel was reckless within the statutory definition and that her reckless act caused Barker's death. We agree. In order to warrant an involuntary manslaughter instruction, there must be some evidence of "reckless" conduct. (Ill. Rev. Stat. 1985, ch. 38, par. 9—3(a); *People v. Ford* (1987), 163 Ill. App. 3d 497, 504, 516 N.E.2d 766, *appeal denied* (1988), 119 Ill. 2d 563, 522 N.E.2d 1249.) Recklessness is defined by section 4—6 of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 4—6) as follows:

> "A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." Ill. Rev. Stat. 1985, ch. 38, par. 4—6.

At issue, then, is whether the record contains any evidence of acts by Whiters which, if believed by the jury, could reasonably be concluded reckless conduct, and those acts which caused Barker's death. Generally, in a murder trial, it is error to refuse instructions on manslaughter if the record holds any evidence which, if believed, would reduce the crime to a lesser offense. (*People v. Gibson* (1990), 197 Ill. App. 3d 162, 169, 553 N.E.2d 1128, 1132; *People v. Jenkins* (1975), 30 Ill. App. 3d 1034, 1037, 333 N.E.2d 497.) The trial court committed reversible error by refusing the involuntary manslaughter instruction when the following evidence existed by Whiters' testimony as well as Erma Allen's: that Whiters and Barker were quarreling; that Barker had ripped the telephone off the wall; that Barker physically assaulted Whiters; that Whiters grabbed a kitchen knife and held it at her waist; that Barker approached Whiters; that she screamed, "[O]h my God, I didn't mean it" after Barker was stabbed and fell to the ground; and that Whiters attempted to summon help immediately. Consequently, if the jury believed Whiters, it could have concluded that she knew or should have known that pointing the knife at Barker in the middle of an obviously heated verbal and physical domestic quarrel created the strong possibility of death or great bodily harm. Whether this evidence establishes recklessness, rather than intent to kill, is ultimately a question of fact for the jury. Accordingly, we conclude that this case must be remanded for a new trial, in which the court below shall instruct the jury on involuntary manslaughter.

Despite the necessity of a new trial, we address other issues because they are likely to come up again upon retrial.

■ Whiters argues that the trial court improperly instructed the jury because non-IPI instructions were given. We disagree. The trial court did not err in its jury instructions when it determined that the original IPI Criminal 2d No. 26.01 would avoid juror conflict and confusion. (Illinois Pattern Jury Instructions, Criminal, No. 26.01 (2d ed. 1981) (hereinafter IPI Criminal 2d).) Although IPI Criminal 2d No. 26.01 recommends that separate guilty and not guilty verdict forms be submitted to the jury on both murder and voluntary manslaughter, the trial court is not obligated to give a not guilty verdict form for each charge (*People v. Ford* (1987), 163 Ill. App. 3d 497, 505, 516 N.E.2d 766, *appeal denied* (1988), 119 Ill. 2d 563, 522 N.E.2d 1249), because inconsistent verdicts and juror confusion have resulted from the use of separate forms. (*People v. Hoffer* (1984), 122 Ill. App. 3d 13, 23-24, 460 N.E.2d 824, *aff'd* (1985), 106 Ill. 2d 186, 478 N.E.2d 335, *cert. denied* (1985), 474 U.S. 847, 88 L. Ed. 2d 114, 106 S. Ct. 139.) Accordingly, this court has held that using the original form of IPI Criminal 2d No. 26.01 is not error. *People v. Ford* (1987), 163 Ill. App. 3d 497, 505-06, 516 N.E.2d 766, *appeal denied* (1988), 119 Ill. 2d 563, 522 N.E.2d 1249.

■ ■ Further, Whiters argues that she was denied a fair trial because the trial court excluded her testimony regarding a conversation she had with Barker on the bus the day before his death. Whiters contends that the testimony was admissible to demonstrate Barker's state of mind and the effect the conversation had on her state of mind. We disagree. Whiters' testimony regarding the alleged conversation was not admissible to show Barker's state of mind because there was no reasonable probability that the testimony was truthful. Extrajudicial statements that demonstrate a declarant's state of mind are admissible as an exception to the hearsay rule if the declarant is unavailable and there is a reasonable probability the testimony is truthful. (*People v. Goodman* (1979), 77 Ill. App. 3d 569, 574, 396 N.E.2d 274.) While Barker was unavailable, there was no reasonable probability that Whiters' testimony was truthful because there was not any evidence or witnesses, other than Whiters, that corroborated that Barker allegedly told her that he "beat that bitch's [Hargrove'] ass; that he was hitting her with his fist; kicking her in her stomach and in her pussy; and that he pistol whipped her [Hargrove]—trying to kick her pussy out." Additionally, the alleged conversation was too remote and irrelevant to Whiters' state of mind because Whiters' subsequent actions, such as allowing Barker to spend the night at her apartment and allowing him to return the following day, indicated that she did not feel threatened by Barker as a consequence of such statements. Moreover, according to Whiters' testimony, she did not feel threatened during their prolonged fight on February 15.

"Q. You went back into that kitchen area?

A. Yes.

Q. Why did you go there?

A. I had clothes to hang up, food to turn over, I was cooking, fixing to clean up, washing.

Q. So you were worried about cleaning off the kitchen area and taking care of the clothes?

A. Right.

Q. So would it be fair to say up to that point you weren't worried about Cecil Barker?

A. I was worried about whether he was doing—you know, because he wasn't leaving.

Q. When you walked into the kitchen area you weren't worried about Cecil Barker, were you?

A. I was wondering how I was going to get out.

Q. You weren't afraid about him killing you, were you?

A. No.

Q. You weren't afraid about him beating you, were you?

A. I didn't know what he was going to do."

Accordingly, the trial court properly excluded Whiters' testimony about the bus conversation.

██ █ Finally, Whiters argues that she was denied a fair trial when testimony regarding Barker's good character and reputation was admitted into evidence in the State's case in chief and in rebuttal. We agree. The State may not present evidence of the victim's character as a quiet and peaceful man unless the defendant has first offered evidence of the victim's character as a turbulent and quarrelsome man, even where the issue of self-defense has been interposed. (*People v. Lester* (1981), 102 Ill. App. 3d 761, 768, 430 N.E.2d 358, citing *Kelly v. People* (1907), 229 Ill. 81, 89, 82 N.E.2d 198, 201.) Although the defense attorney in her opening statement stated that she intended to show Barker's violent and jealous nature, the opening statement is not evidence. In fact, the jury was instructed that the opening statement is not evidence. Accordingly, the trial court erred in allowing Barker's mother's testimony and Barker's stepfather's testimony in the State's case in chief because the defense had not first offered evidence of Barker's character. Furthermore, the trial court erred in allowing the rebuttal testimony of Barker's employer. "[E]vidence of character is confined to proof of a person's general reputation, and it is error to prove character by personal opinion or specific acts." (*People v. Goodwin* (1981), 98 Ill. App. 3d 753, 757, 424 N.E.2d 429, citing *People v. Willy* (1921), 301 Ill. 307, 133 N.E.2d 859.) Consequently, the complained-of testimony was reversible error be-

cause Whiters was prejudiced by the improper character evidence that tended to rebut Whiters' claim of self-defense by the State's introduction of evidence that Barker had a peaceful character.

For the reasons stated above, the judgment of the circuit court of Cook County is reversed, and the case is remanded for a new trial.

Reversed and remanded.

BUCKLEY, P.J.,* and CAMPBELL, J., concur.

---

*Subsequent to oral argument, Justice Manning recused herself. Justice Buckley read the briefs, listened to the taped oral argument and participated in the decision.