THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* EDDIE CARPENTER *et al.*, Defendants-Appellants.

First District (4th Division)   No. 78-675

Opinion filed July 19, 1979.

Ralph Ruebner and Kenneth L. Jones, both of State Appellate Defender's Office, of Chicago, for appellant Eddie Carpenter.

Howard T. Savage, of Chicago (Howard O. Edmonds, of counsel), for appellant Jimmy Hendrix.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Mary Ann Callum, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

The defendants, Eddie Carpenter and Jimmie Hendrix, were convicted of murder following a jury trial in the circuit court of Cook County. Carpenter was sentenced to a term of 60 to 100 years and Hendrix to a term of 35 to 75 years. The defendants have filed separate briefs on appeal. Both defendants argue the trial court erred in denying their motion for a new trial on the ground of newly discovered evidence. In addition, Carpenter argues the trial court committed reversible error in refusing to allow him to elicit from an investigating officer prior inconsistent statements made by key identifying witnesses and contained in the officer's police report. Hendrix argues (1) that he was denied the effective assistance of counsel because his trial attorney also represented Carpenter, whose defense was antagonistic to his own; (2) that he was not proved guilty of murder or accountability for murder beyond a reasonable doubt; and (3) that the trial court abused its discretion in imposing sentence without considering his rehabilitation prospects.

Charles Maddox testified that on April 4, 1976, he was at a tavern called Pete's Place at 1646 South Pulaski, in the city of Chicago, where the Ex-Cl Club was sponsoring a show. J. P. Harper, the decedent, was at the front door collecting admission money. Maddox was standing close to the door when two men entered the vestibule. At trial, Maddox identified the taller man as the defendant Hendrix and the shorter as the defendant Carpenter. The defendants did not speak to each other, and Maddox did not know if they were together. The decedent told Hendrix he could not stand in the doorway unless he bought a ticket. Carpenter remained in

the vestibule. Hendrix proceeded a couple of steps into the tavern. The decedent touched him on the arm and said he could not go any further without paying. Hendrix told the decedent to remove his hands and to come outside. Hendrix and the decedent exited the bar together. Maddox followed them. A fist fight ensued involving Maddox, the decedent and two other tavern patrons against Hendrix. Hendrix started the fight. Carpenter was seen leaving shortly before the fight began. When the fight was over, Hendrix walked away and the others returned to the tavern. Fifteen or twenty minutes later Maddox heard a loud bang from the front of the tavern. Maddox was near the back door at this time. He ran to the front and found the decedent lying on the floor. Maddox identified Hendrix's photograph and later identified Carpenter in a lineup. On cross-examination, Maddox stated he had been unable to make a positive identification of Hendrix from the photographs. Maddox described Hendrix as wearing a short maroon leather jacket and dark pants.

Alex Mauldin testified that he was also at Pete's Place on the night of the shooting. He identified Hendrix as being present in the tavern before the shooting. Mauldin confirmed Maddox's testimony concerning the fight outside the bar, and said he did not see Carpenter during or after the fight. He did not see the actual shooting. Mauldin identified Hendrix in a photo display and in a lineup.

Johnny Jones identified the defendants at trial as the men he saw at Pete's Place and corroborated the previous witnesses' testimony concerning the fight. Jones did not see the shooting. He turned around when he heard the gunshot and saw the backs of two men going out the door. One was short and wore a burgundy three-quarter length coat and the other was tall and wore a greenish outfit. Jones testified that these men were the defendants and that they had switched coats with each other between the time the fight occurred and the actual shooting. Jones identified the defendants from photographs and in lineups.

Fredricka Robinson testified that she saw a short black man enter the tavern wearing a maroon leather coat. He had something in his hand that looked like a pipe. It was 4 to 5 inches long and black. She heard a bang and saw a flash from the object in his hand. The decedent fell to the floor. Robinson identified the gunman as Carpenter. Robinson also testified that she thought Carpenter was alone when she saw him in the vestibule. He backed out the door and she did not see anyone behind him.

Hartesine Reed testified she was near the front door with the decedent when the defendants first entered. She identified them at trial. She witnessed the fist fight. Reed saw both defendants in the doorway again after the dancing began. She heard a gunshot within a matter of seconds after seeing the defendants for the second time. She did not see anyone in the vestibule immediately after the shooting. The first time she

saw the defendants, Carpenter was wearing a green leather coat and Hendrix a burgundy coat. When she saw them the second time Carpenter was wearing the burgundy coat and Hendrix the green coat.

Thomas Shine, a Chicago police officer, testified that at 11 p.m. on the night of the shooting he responded to a radio call which reported a shooting at 1646 Pulaski. He went directly to Pete's Place at that address. Close to 100 people were there. He spoke to most of the State's witnesses. He talked to Reed and asked her if she could identify the individuals who were involved in the shooting. She said she could.

Bill Cobbs, a defense witness, stated he was at the Cozy Corner Lounge at 16th and Ridgeway in Chicago on the night of the shooting. The Cozy Corner is six blocks from Pete's Place. The defendants were at the Cozy Corner when he arrived. Cobbs said he had known both defendants for a number of years. Cobbs did not see the defendants leave the bar between 9 p.m. and 2 a.m. When he left at 2:15 a.m. the defendants were still there. Rodney Jackson, Barry Grant, David Cobbs and Ella Crawford also testified that the defendants were at the Cozy Corner all that evening.

In rebuttal Chicago Police Officer Curtis Jones testified that he was at the Cozy Corner about 1:30 a.m. the night of the shooting and he did not see Hendrix. Nor did he see Crawford, Cobbs, or Jackson, all of whom he knew. He did not know Carpenter and could not say if Carpenter was at the Cozy Corner. In surrebuttal, the defense called Cobbs, Crawford, Grant and Jackson who testified that they had known Jones for a number of years and that they did not see him in the Cozy Corner on the night of the shooting.

Following the jury's return of the guilty verdicts, the defense filed a motion for a new trial on the basis of newly discovered evidence. The new evidence consisted of the testimony of Vickie Flowers who was working as a barmaid at Pete's Place on the night of the shooting. Flowers was not called as a witness at trial because her whereabouts was unknown. If Flowers were allowed to testify she would contradict the testimony of Robinson. She would say that she was close to the vestibule at the time of the shooting and that no one was sitting or standing at the end of the bar near the vestibule at that time. She would also testify that she did not see the actual shooting. Flowers was present in court when the motion was denied.

On appeal, both defendants argue that the trial court erred in denying their motion for a new trial based upon newly discovered evidence. They submit that they acted diligently in locating Flowers, that her testimony would not have been merely cumulative, and that it would be conclusive enough so as to probably change the verdict on retrial. They argue that Flowers' testimony that none of the patrons were

standing close to the vestibule at the time of the shooting would have demonstrated that Jones, Robinson and Reed were unable to observe the perpetrator of the crime. Hendrix also argues the trial judge abused his discretion in not putting Flowers on the stand during the hearing on the motion for a new trial.

■■■ To warrant a new trial the newly discovered evidence must be of such a conclusive character that it will probably change the result on retrial. Motions for a new trial on this basis are not looked upon favorably by the courts. In order to prevent fraud and imposition on the part of the defeated party, such motions will always be subjected to the closest scrutiny by the court. The burden is upon the applicant to rebut the presumption that the verdict is correct and to show that there has been no lack of diligence. The question is largely discretionary on the part of the trial court and the exercise of its discretion will not be disturbed on appeal except in the case of a manifest abuse. *People v. Reese* (1973), 54 Ill. 2d 51, 294 N.E.2d 288; *People v. Baker* (1959), 16 Ill. 2d 364, 158 N.E.2d 1; *People v. Holtzman* (1953), 1 Ill. 2d 562, 116 N.E.2d 338.

The Illinois Supreme Court has also noted that:

> "A distinction is to be drawn between evidence which impeaches a witness in the sense that it affects the credibility of the witness, and evidence which is probative in that it presents a state of facts which differs from that to which the witness testified. Newly discovered evidence, the effect of which is to discredit, contradict and impeach a witness, does not afford a basis for the granting of a new trial. If, however, it contradicts a witness by showing facts, a new trial may be ordered when it appears that such new evidence has sufficient probative force or weight to produce a result different from that obtained at the trial which has been had." *Holtzman* 1 Ill. 2d 562, 568, 116 N.E.2d 338, 341.

■■ The testimony of Vickie Flowers, as described by the defense counsel, seems to be more accurately termed impeachment testimony rather than testimony which contradicts by showing facts. In its best light, Flowers' proposed testimony would contradict that of Robinson, Reed, Jones and Maddox, all of whom testified that there were a number of people at the front end of the bar at the time of the shooting. However, even if we interpret the new evidence as showing facts, we cannot say that this testimony would have sufficient probative force or weight to produce verdicts of not guilty. Flowers did not see the actual shooting and could have done no more than to testify to the location of some of the State's witnesses at the time of the shooting. Under these circumstances, we conclude that the defendants have not met their burden of rebutting the presumption that the verdict is correct or that the trial court displayed a manifest abuse of discretion in denying the motion for a new trial.

Hendrix argues he was not found accountable for the murder of the decedent beyond a reasonable doubt. The accountability statute specifies:

> "A person is legally accountable for the conduct of another when:
>
> * * *
>
> (c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill. Rev. Stat. 1975, ch. 38, par. 5—2(c).)

Hendrix argues there is no evidence that he aided or abetted Carpenter in the shooting of the decedent.

The State responds that the evidence shows Hendrix is accountable because (1) he stood with Carpenter when Carpenter shot the decedent; (2) he fled with Carpenter after the murder; and (3) he exchanged coats with Carpenter after their first visit to Pete's Place. The State points out that the exchange of coats would make the identification of the defendants more difficult and that Hendrix's larger coat, when worn by Carpenter, would conceal the shotgun more easily.

■ It is well established that mere presence at the scene of a crime or negative acquiescence in the commission thereof is not sufficient to find a person guilty under section 5—2(c) of the Criminal Code. (*People v. Clark* (1963), 30 Ill. 2d 67, 195 N.E.2d 157.) However,

> "[i]f the proof shows he was present at the crime without disapproving or opposing it, the trier of fact may competently consider this conduct in connection with other circumstances and thereby reach a conclusion that such person assented to the commission of the criminal act, lent his countenance and approval and was thereby aiding and abetting the crime." (Clark, 30 Ill. 2d 67, 72, 195 N.E.2d 157, 160.)

Other cases have concluded that presence at the scene of the occurrence and flight therefrom in the absence of "other circumstances" from which guilt may be inferred, are not sufficient to find a defendant guilty under an accountability theory. *People v. Fletcher* (1977), 46 Ill. App. 3d 530, 361 N.E.2d 97; *People v. Bolden* (1978), 59 Ill. App. 3d 441, 375 N.E.2d 898.

We believe the inferences to be drawn from the circumstances, other than Hendrix's presence and apparent negative acquiescence during the shooting and flight, are tenuous at best. The evidence shows that Carpenter and Hendrix were acquainted and were at Petes's Place, an establishment of public entertainment, prior to the occurrence and again at the time of the occurrence. The exact circumstances of the defendants being together is not known. We do know that Carpenter left when the fight involving Hendrix began. We also know the defendants were seen

again by Reed, and perhaps Jones, after the shooting when they left Pete's Place. Finally, we know they used the same alibi witnesses at trial and those witnesses said the defendants were both at a different tavern during the shooting. There is no evidence that the defendants agreed upon any plan concerning illegal acts. The nature of the crime does not suggest a mutual benefit unless it can be said that Carpenter shot the decedent to avenge Hendrix's fight with the decedent earlier that evening. Such a supposition is highly speculative.

The State's contention that the switching of coats was designed to conceal a weapon and frustrate identification is conceivable but not persuasive. The only evidence in the record to indicate the size of the weapon is from Robinson who said that the object held by Carpenter looked like a pipe and was four or five inches long. We do not know the other dimensions of the weapon and cannot tell whether a larger coat was necessary to help conceal it.

A jury's verdict will not be reversed unless the evidence is so "unreasonable, improbable or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." (*People v. Tate* (1976), 63 Ill. 2d 105, 108, 345 N.E.2d 480, 482.) In the totality of circumstances presented here we believe the evidence of Hendrix's guilt is unsatisfactory. *People v. De Stefano* (1961), 23 Ill. 2d 427, 178 N.E.2d 393; *People v. Reese* (1966), 34 Ill. 2d 77, 213 N.E.2d 526.

Because of our disposition of the accountability issue, we need not reach the other issues raised by Hendrix.

Carpenter's final argument is that the trial court committed reversible error in refusing to allow defense counsel to elicit from police officer Shine prior inconsistent statements made by Robinson and Reed which were contained in his police report.

On cross-examination of Reed she was asked:

"Q. Did you tell the police that you had seen the shooting?
A. No, I didn't.

* * *

Q. Miss Reed, did you at any time prior to today tell certain police officers that you could identify the man who shot J. P. Harper?
A. No."

During the direct examination of Robinson she said she witnessed the shooting and that she saw only Carpenter at the door of Pete's Place at that time.

On cross-examination she was asked:

"Q. And did you talk to the police [at Pete's Place]?
A. I talked to one officer, yes.
Q. What did you tell him, if anything?
A. He asked, did anybody see the shooting.

Q. And did you answer him?

A. I told him I did.

Q. And did you tell him substantially what you have said on the witness stand today?

A. No, because * * *

Q. Well, what did you tell the police officers at that time and place?

A. I told him, the police officer, that I had seen the shooting."

In an offer of proof defense counsel stated that the police report indicated Reed did see the actual shooting and could identify the person who did the shooting, whereas Robinson according to the police report said she did not see the actual shooting and that she had seen two men at the time of the shooting.

Carpenter argues the report was admissible to impeach Reed and Robinson through their prior inconsistent statements contained in the report. We do not believe that this evidentiary ruling constituted reversible error, if error at all.

Shine's testimony concerning his conversation with Reed on the night of the shooting corroborated Reed's testimony: both said Reed told Shine she could identify the "persons involved." Assuming that the report actually said "Reed told me she saw the shooting," as posited in the offer of proof, this could easily have been Shine's interpretation of a statement by Reed that she "could identify the persons involved." Therefore, a clear inconsistency may not have been present, and we conclude that any error in excluding the report was harmless.

■■ Carpenter also claims the report indicated that Robinson said she saw two men at the time of the shooting rather than one and also that she did not see the actual shooting. If true, this would be an appropriate subject of impeachment. (*People v. Green* (1971), 133 Ill. App. 2d 244, 272 N.E.2d 721.) However, a proper foundation was not established. Robinson was not asked by defense counsel if she ever told the police that she saw two men rather than one and was not asked if she told the police she did not see the shooting. (*Crespo v. John Hancock Mutual Life Insurance Co.* (1976), 41 Ill. App. 3d 506, 354 N.E.2d 381.) Therefore, a report containing those statements would not have been admissible for impeachment purposes. Under these circumstances, any error in excluding the report was harmless.

For the foregoing reasons we reverse the judgment as to Hendrix and affirm as to Carpenter.

Affirmed in part and reversed in part.

JOHNSON and ROMITI, JJ., concur.