THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. VINCENT MARTINEZ, Defendant-Appellant.

First District (1st Division) No. 1—89—1556

Opinion filed December 28, 1992.—Rehearing denied April 12, 1993.

916

Morton L. Zaslavsky, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee G. Goldfarb, Veronica X. Calderon, and Karen H. Iwasaki, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant Vincent Martinez was found guilty of murder and concealment of a homicidal death. Defendant was sentenced to 30 years' imprisonment. Defendant now appeals his conviction. For the reasons which follow, we affirm.

The record on appeal indicates the following facts. Prior to trial, defendant moved to suppress two oral and two written statements he made to the police on May 19, 1987. Following a hearing, the trial court denied the motion.

Following jury selection and opening statements, the State called Detective Kenneth Polzin, Jr., of the Kenosha County, Wisconsin, sheriff's department as a witness. Detective Polzin testified that on the afternoon of May 17, 1987, he was assigned to investigate the discovery of a body in Bristol Township. He testified that photographs depicted the scene, including a charred body, with an address book and folded court records to the left side of the body. The photographs also indicated that trees in the immediate area appeared burnt. Detective Polzin took custody of the address book and court records for further examination. Detective Polzin testified that on May 18, 1987, it

was determined from fingerprint records that the body was that of Arnulfo Ortuno.

Kenosha County medical examiner and pathologist Dr. John Sanson testified that he viewed the body on May 17, 1987, and performed an autopsy on May 18, 1987. Dr. Sanson opined that the body was dumped within 12 to 24 hours before he viewed it at 4:30 p.m. on May 17, 1987.

Dr. Sanson testified that an external examination of the body indicated an extensive burning and charring of the body. Dr. Sanson also testified that the small amount of carbon monoxide present in the body indicated that the person had died before the body was burned. The external exam also showed multiple contusions on the skin on top of the head and forehead. The contusion on the forehead could have been caused by a blow from a piece of wood or the base of a knife, but was inconsistent with a blow from a blunt object, such as a fist. The other contusions could have been caused by a fist or other blunt object.

Ultimately, Dr. Sanson testified that the death was a homicide caused by strangulation of the windpipe. The external examination indicated hemorrhaging in the area of the muscles around the windpipe. The internal investigation indicated hemorrhaging of tissue covering the windpipe inside the bone.

Delores Couty testified that on May 17, 1987, she was defendant's upstairs neighbor in a three-story building. Couty stated that on May 17, 1987, at about 1 a.m., she heard noises coming from defendant's apartment. The noises sounded like a scuffle. Couty went to her dining room window, which was open. She looked down and could see a light on in defendant's apartment. Couty testified that she heard a voice, but could not make out what it was saying. As Couty returned to her bedroom, she heard a voice she did not recognize saying "Help. Police. Help." A few minutes later, Couty heard footsteps coming up the back stairs. She then heard keys rattling and the door to defendant's back porch being unlocked. Couty then heard footsteps hurrying along the kitchen floor and back down the rear stairway.

Couty testified that she got out of bed and went to her bedroom window. She could see defendant's car parked right at the curb on Damen. She also saw a tall man opening and unlocking doors to defendant's car. Couty testified that she returned to bed, but rose again upon hearing the ground-floor door slam shut. From her bedroom window, Couty saw the tall man and defendant drag a man from the building and put this third man in the rear seat of defendant's car. The tall man then drove away in defendant's car, with

defendant in the passenger seat and the third man in the rear of the car. Couty identified defendant in court.

Chicago police sergeant Casey Orr indicated that on May 19, 1987, he was a detective with the violent crimes unit. On the morning of May 19, 1987, Orr and his partner, James Spencer, were investigating the Ortuno homicide. At about 11 a.m., two detectives from Kenosha (named Polzin and Zielsdorf) arrived at Orr's office. The four detectives proceeded to an office building on La Salle Street in search of defendant, whom Orr identified in court. The detectives met defendant between 11:30 a.m. and noon. Orr testified that he asked defendant to accompany him to the police station, to which defendant agreed.

At the police station, defendant was placed in an interview room. Orr testified that he informed defendant of his constitutional rights. According to Orr, defendant indicated that he would answer Orr's questions. In the presence of Zielsdorf, defendant told Orr that on the night in question, defendant had attended a party and had not returned home the entire evening. Orr testified that he told defendant that this was contrary to other information he had in his possession.

According to Orr, defendant then stated that on the night in question, he had been with his friends: Chico, Lefty and Edwin. After an evening of drinking, they dropped Edwin at home and the three men went to defendant's apartment. Chico and Lefty got into an argument, which escalated into a fight. Lefty punched Chico in the head and choked him. Chico fell unconscious to the floor. Defendant and Lefty dragged Chico out to defendant's car. Defendant and Lefty drove north on Route 41 toward Kenosha. Chico stopped breathing on the way to Wisconsin. Upon reaching Kenosha County, they found a secluded area where they pulled Chico's body from the car, poured gasoline on it and set the body on fire. Defendant and Lefty then returned to Chicago.

Orr testified that defendant then elaborated on this version of events. Initially, defendant and Chico argued about Chico's alleged involvement with defendant's wife. Defendant told Orr that he punched Chico in the face, then went into the kitchen, got a knife and threatened to kill Chico, at which point the argument subsided. While defendant was returning the knife to the kitchen, Chico and Lefty renewed an earlier argument. Defendant saw that Lefty had Chico in a hammerlock around the neck and was punching him. When Lefty let go, Chico fell to the floor and had difficulty breathing. After a few moments, Chico stopped breathing. Defendant told Lefty that he thought Chico was dead; Lefty laughed. Defendant told Lefty they

had to remove Chico's body from the apartment because his wife was coming home.

The two men loaded Chico's body into defendant's car. While driving around the neighborhood, Lefty suggested stabbing the body and dumping it in a nearby alley. Defendant responded, "No, the police will figure out who he is and what happened." Defendant suggested driving to Wisconsin to dump the body in a field. En route to Wisconsin, the two men decided to burn the body, stopping at one gas station to buy a gasoline can and a gallon of gasoline and another station to buy matches. Lefty struck the match that burned Chico's body.

Orr testified that defendant told him that after disposing of Chico's body, defendant took Lefty home. Defendant did not return home after seeing a squad car parked in front of his building. Instead, defendant went to his brother's home and later to his father's home. While at his father's home, defendant phoned Edwin and told him that "Chico is dead—we killed him." Orr testified that defendant stated that he ultimately contacted his wife; the two spent the night in a hotel.

Detective Jon Cole testified that on May 22, 1987, he recovered a gasoline can from the home of defendant's brother.

Assistant State's Attorney Richard Stevens testified regarding two written statements made by defendant on May 19, 1987. Stevens stated that defendant was informed of his constitutional rights before making these statements. Stevens further testified that defendant told him that he could not read English. Stevens believed defendant understood English, but had a court reporter take down the second written statement so that an independent person was involved. Stevens read the first written statement; the second was published to the jury. Stevens testified regarding corrections made by himself and defendant to each statement. The contents of the first written statement are substantially similar to defendant's earlier oral statements to Orr. The first written statement also identifies Lefty as Mauricio Sanchez and Chico as Arnulfo Ortuno.

Defendant testified that he was 34 years old, born and raised in Chicago. Although he spoke English, he could read neither English nor Spanish. According to defendant, when the police arrived at his place of employment, Orr stated that he wanted to ask defendant about an automobile accident. Defendant indicated that he did not wish to answer questions, at which point Orr stated that if he did not go to the police station, defendant would be dragged from the building. According to defendant, once he was put in the interview room at the police station, he told Orr he wanted to see his lawyer and

gave Orr the lawyer's business card. Orr refused the card. Defendant spoke to Orr only after Orr poked defendant's chest and legs. Defendant testified that he was never informed of his constitutional rights, though he knew he had a right to an attorney.

Defendant further testified that after drinking and returning Edwin Roldan to his home, defendant, Lefty and Chico went back to defendant's home and resumed drinking. Defendant got into an argument with Chico because Chico swore in defendant's home. Defendant slapped Chico twice, but did not throw a punch. According to defendant, Chico threatened his life, which prompted defendant to get a knife from the kitchen. Defendant admitted that he may have threatened to kill Chico. Defendant held the knife to Chico's cheek, then put the knife back in the kitchen.

Returning from the kitchen, defendant saw Lefty choking and hitting Chico with something. Defendant testified that he saw Lefty throw a knife over the couch. It looked to defendant as if Chico stopped breathing shortly after falling to the floor.

Defendant stated that Lefty was over 6 feet tall, had a black belt in karate and was a leader of a gang called the Latin Kings. Defendant further testified that Lefty made him help put Chico's body in the back of defendant's car, buy gasoline and matches and pour gasoline on the body. Defendant stated that he complied with Lefty's orders out of fear that he would also be killed. Defendant denied suggesting that disposing of the body would cause the police to discover what happened. Defendant testified that he heard Chico breathe while in defendant's car. According to defendant, upon returning to Chicago, Lefty collected and disposed of Chico's clothes.

Defendant testified that he parked his car across the street from his building, but did not enter his apartment. He and his wife spent the following night at a motel out of fear of Lefty. According to defendant, he told Edwin Roldan that he and Lefty killed Chico because he had believed that the gasoline caused Chico's death. Defendant denied killing Chico.

The parties stipulated that if the Reverend Willis Darling were called to testify, he would testify that defendant's reputation in the community for honesty, integrity and truthfulness was good.

Edwin Roldan testified that on the night in question, he had been drinking beer with defendant, Lefty and Chico, but defendant drove him home at about 10 p.m. According to Roldan, he spoke with defendant outside of Roldan's apartment the following day. Roldan testified that defendant told Roldan that Chico was dead, stating that "we killed him" and "we beat him up, we choked him." Defendant

also told Roldan that defendant had poured the gasoline on Chico and Lefty lit the body on fire. According to Roldan, defendant stated that Chico was killed for having a "big mouth," having told defendant's wife that defendant was "messing around with other girls." Roldan stated that defendant told him they had to kill Chico.

Following closing arguments and deliberations, the jury found defendant guilty of murder and concealment of a homicidal death. Defendant was sentenced to 30 years' imprisonment. Defendant now appeals.

# I

Defendant argues that the State failed to prove him guilty of murder beyond a reasonable doubt. Defendant contends that Sanchez, a/k/a Lefty, committed the murder. The relevant inquiry on appeal is whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt, after viewing the evidence in the light most favorable to the prosecution. (*People v. Jimerson* (1989), 127 Ill. 2d 12, 43-44, 535 N.E.2d 889, 903.) It is axiomatic that determining the credibility of witnesses and the weight to be given to their testimony is the function of the trier of fact. Mere conflicting evidence does not mandate reversal. This court will not disturb a guilty verdict unless the evidence is so improbable or unsatisfactory that it raises a reasonable doubt as to defendant's guilt. *People v. Brandon* (1990), 197 Ill. App. 3d 866, 874, 557 N.E.2d 1264, 1269.

The State notes that the jury in this case was instructed on the theory of accountability. A person is accountable for the conduct of another if "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill. Rev. Stat. 1987, ch. 38, par. 5—2(c).) Consent to or mere knowledge of the commission of a crime does not constitute the aiding, abetting, planning or commission of that offense. (*People v. Reid* (1990), 136 Ill. 2d 27, 61, 554 N.E.2d 174, 190.) Nor does the mere presence of a defendant at the scene of the crime render him or her accountable (*Reid*, 136 Ill. 2d at 61, 554 N.E.2d at 190; *People v. Ruiz* (1982), 94 Ill. 2d 245, 256, 447 N.E.2d 148, 152; *People v. Ruckholdt* (1984), 122 Ill. App. 3d 7, 10, 460 N.E.2d 847, 850), even when coupled with defendant's flight from the scene or knowledge that a crime was being committed. *Reid*, 136 Ill. 2d at 61, 554 N.E.2d at 190.

On the other hand, active participation in an offense is not a prerequisite to establishing accountability. (See *Ruiz*, 94 Ill. 2d at 254, 447 N.E.2d at 151.) Evidence of events surrounding and following the commission of the crime is competent to show participation in the crime itself. (*Ruiz*, 94 Ill. 2d at 257, 447 N.E.2d at 152.) For example, "proof that the defendant was present during the perpetration of the offense, that he maintained a close affiliation with his companions after the commission of the crime, and that he failed to report the crime are all factors which the trier of fact may consider in determining the defendant's legal accountability." (*Ruckholdt*, 122 Ill. App. 3d at 11, 460 N.E.2d at 850.) Defendant's flight from the scene may also be considered. *People v. Dotson* (1986), 143 Ill. App. 3d 135, 142, 492 N.E.2d 903, 907.

■ In this case, the expert medical testimony established strangulation as the cause of death. Defendant testified that Lefty strangled and beat Chico on the head. Defendant also admitted to holding a knife to Chico's face and threatening to kill him just prior to his death. Orr testified that defendant admitted to punching Chico in the face. The State argues that the blow to Chico's forehead with the base of a knife was delivered by defendant rather than Lefty. According to defendant, he watched Lefty strangle Chico, then assisted Chico in loading the body into the back of defendant's car. Orr testified that defendant dissuaded Lefty from stabbing the body and dumping it in a nearby neighborhood, suggesting that the body be disposed of in Wisconsin in order to avoid detection by the police. Defendant accompanied Lefty to Wisconsin, purchasing gasoline and matches along the way. Defendant poured the gasoline on Chico's body. Orr testified that defendant avoided returning to his apartment after seeing a police car in front of the building; instead, defendant and his wife stayed in a motel. Edwin Roldan testified that defendant told him that "we killed him" and "we beat him up, we choked him." At no time did defendant attempt to notify the police about the matter. Defendant offered testimony which tended to place this evidence in a more exculpatory light or even contradicted this evidence, but it is the jury, rather than this court, that weighs the credibility of the witnesses. Viewed in the light most favorable to the State, the record supports the jury's verdict finding defendant accountable for the murder of Arnulfo Ortuno.

The cases defendant relies upon for support are easily distinguishable from this case. For example, in *People v. Hoskins* (1990), 203 Ill. App. 3d 45, 54, 560 N.E.2d 1004, 1010, the codefendant was not present during the commission of the offense. In *People v. Williams*

(1986), 140 Ill. App. 3d 784, 787, 489 N.E.2d 28, 30, a robbery case, the State failed to establish that the defendant knew the robber. In *People v. Deatherage* (1984), 122 Ill. App. 3d 620, 624, 461 N.E.2d 631, 634, this court held that the State failed to show that the defendant, who was present in an apartment during a narcotics transaction and may have been aware of the transaction, was not an innocent bystander. In *People v. Carpenter* (1979), 74 Ill. App. 3d 770, 774-75, 393 N.E.2d 50, 54, the defendant had been involved in a fight with the victim 15 to 20 minutes before the death of the victim at the hand of the codefendant, but the codefendant did not witness this fight and there was no evidence of joint action by the defendants. In this case, the record indicates involvement on the part of defendant and supports a finding of accountability for the murder.

## II

Defendant contends that the trial court erred in granting a motion *in limine* excluding evidence that Sanchez, a/k/a Lefty, was indicted for the murder of Arnulfo Ortuno. Defendant is required to raise the issue both by objection at trial and in his written post-trial motion to preserve the issue for appeal. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130.) Here, defendant failed to object to the court's ruling in his post-trial motion; thus, the argument is waived.

■ Even if the argument had been preserved for review, it would not have prevailed. "An accused may attempt to prove that someone else committed the crime with which he is charged, but that right is not without limitations." (*People v. Enis* (1990), 139 Ill. 2d 264, 281, 564 N.E.2d 1155, 1161.) For example, in *People v. Pryor* (1988), 170 Ill. App. 3d 262, 524 N.E.2d 700, it appeared from the record that the defendant was barred from introducing a certified copy of a codefendant's guilty plea and indictment. (*Pryor*, 170 Ill. App. 3d at 270, 524 N.E.2d at 705.) This court upheld the exclusion because such evidence shed little light on defendant's guilt or innocence; even if it showed the codefendant's guilt, it did not exonerate the defendant. *Pryor*, 170 Ill. App. 3d at 270, 524 N.E.2d at 705.

In this case, defendant sought to introduce the Sanchez indictment to show that Sanchez murdered Ortuno. However, as in *Pryor*, the jury here was instructed on the theory of accountability. Thus, even if we were to conclude that the indictment was proof of Sanchez' guilt, which we do not conclude, it would also tend to prove the State's case. Moreover, the theory of accountability does not require that Sanchez be prosecuted for or convicted on the offense. (Ill. Rev.

Stat. 1987, ch. 38, par. 5—3.) The record indicates that defendant was permitted to pursue the theory that Sanchez was solely responsible for the murder throughout his trial. Thus, defendant has not shown that the exclusion of the indictment was an abuse of discretion.

The cases cited by defendant in support of his argument are inapposite. In *People v. Osborne* (1983), 114 Ill. App. 3d 433, 451 N.E.2d 1, this court held that barring a witness from corroborating a defendant's alibi was too harsh a remedy for a violation of discovery rules. In *People v. Currie* (1980), 84 Ill. App. 3d 1056, 1062, 405 N.E.2d 1142, 1147, this court upheld the trial court's exclusion of evidence regarding police conduct in unrelated incidents.

### III

Defendant contends that he was denied a fair trial because the trial court treated the defense attorneys with disrespect. Defendant refers to three places in the record where this disrespect is allegedly shown. However, the record does not indicate that defendant objected at any of these points in the record. Nor does defendant's post-trial motion raise the issue. Consequently, the issue is waived.

■ Assuming *arguendo* that the issue was not waived, we note that the cumulative effects of partial or biased remarks from the bench may deprive a defendant of a fair trial in a close case. (See *People v. Pressley* (1987), 160 Ill. App. 3d 858, 865, 513 N.E.2d 921, 926.) On the other hand, a trial judge is permitted a limited amount of impatience with counsel and an isolated remark may not warrant a reversal. (See *Pressley*, 160 Ill. App. 3d at 865, 513 N.E.2d at 926.) In this case, a review of the record indicates that this case falls into the latter category, not warranting reversal.

### IV

■ Defendant argues that he was denied a fair trial when the trial court permitted the State to refer to one of defendant's statements as a "story." Defendant relies on a number of Illinois cases holding that a prosecutor may not offer his personal opinion on a defendant's testimony. However, defendant failed to raise this issue in his post-trial motion; thus, it is waived.

Even if defendant had not waived the argument, it would not have persuaded this court. A "story" may be defined as "[t]he narration of an event or series of events, *either true or fictitious*." (Emphasis added.) (American Heritage Dictionary 1201 (2d Coll. ed. 1982).) Thus, the term does not necessarily denote an opinion that defendant was untruthful. Moreover, the record indicates that defend-

ant related several differing versions of events to the police. Consequently, even if the prosecutor was implying that he believed defendant was less than truthful, use of the term was not improper.

## V

Defendant contends that the trial court erred in rejecting his request for a voluntary manslaughter instruction. The record indicates that defendant tendered a second degree murder instruction at trial, which the trial court refused because the second degree murder statute was not in effect at the time of the offense in this case. As defendant did not tender a voluntary manslaughter instruction, the argument is waived. See *People v. Huckstead* (1982), 91 Ill. 2d 536, 543, 440 N.E.2d 1248, 1251.

■ Even if the issue had been preserved, defendant's argument is unpersuasive. In a typical murder trial, it is error to refuse instructions on manslaughter if the record holds evidence which would reduce the crime to the lesser offense. (See *People v. Whiters* (1990), 204 Ill. App. 3d 334, 339, 562 N.E.2d 325, 328, *aff'd* (1992), 146 Ill. 2d 437, 588 N.E.2d 1172.) But the sole case involving voluntary manslaughter relied upon by defendant is *People v. Robinson* (1987), 163 Ill. App. 3d 754, 777, 516 N.E.2d 1292, 1309, in which this court held that where defendant is entitled to a self-defense instruction, a trial court must also give a voluntary manslaughter instruction if requested. (See *Robinson*, 163 Ill. App. 3d at 777, 516 N.E.2d at 1309.) Defendant did not raise self-defense as an issue in this case.

Defendant also contends that the trial court erred in refusing an instruction on involuntary manslaughter. A defendant prosecuted on an accountability theory may be entitled to an involuntary manslaughter instruction. (See *People v. Miscichowski* (1986), 143 Ill. App. 3d 646, 654-55, 493 N.E.2d 135, 140-41.) Involuntary manslaughter differs from murder, which requires that defendant have the intent to kill or cause great bodily harm or knowledge that his or her acts create a strong probability of such a result. (See *People v. Austin* (1990), 207 Ill. App. 3d 896, 899, 566 N.E.2d 492, 494.) A person commits involuntary manslaughter when he or she unintentionally causes the death of a person by a reckless act which is likely to cause death or great bodily harm to another. (See Ill. Rev. Stat. 1985, ch. 38, par. 9—3(a).) Thus, an involuntary manslaughter instruction is unnecessary when the nature of the killing defeats any assertion of reckless or inadvertent behavior. See *People v. Trotter* (1988), 178 Ill. App. 3d 292, 298, 533 N.E.2d 89, 92.

■ As the above discussion indicates, the difference between involuntary manslaughter and murder is the mental state involved. Mental states are typically not proved by direct evidence; rather, intent may be inferred from the character of the acts and circumstances involved in an offense. (*People v. Summers* (1990), 202 Ill. App. 3d 1, 10, 559 N.E.2d 1133, 1138.) In this case, the record indicates that Chico died from strangulation of the windpipe while receiving blows to the head from both a blunt instrument and an object such as the base of a knife. Such evidence supports the conclusion that Lefty intended to kill or do great bodily harm to Chico. (*Cf. People v. Smith* (1966), 71 Ill. App. 2d 446, 454-55, 219 N.E.2d 82, 86-87 (placing leather belt around victim's neck and dragging victim such that breathing was cut off is indicative of intent to murder).) Defendant has not pointed to any evidence indicating that this strangulation was merely inadvertent or reckless. Indeed, Edwin Roldan testified that defendant told him that defendant and Lefty had to kill Chico because he had a "big mouth" and could no longer be trusted. Consequently, the refusal of the involuntary manslaughter instruction was not in error.

Defendant primarily relies on *Whiters*, in which a heated domestic quarrel resulted in death. The factual differences between that case and this one are numerous. (See *Whiters*, 204 Ill. App. 3d at 339, 562 N.E.2d at 328.) For example, defendant in this case did not attempt to summon help at any time.

## VI

■ Defendant argues that the trial court erred by refusing to excuse a venireperson for cause after she stated that her verdict might be affected by the fact that her daughter was beaten and choked 15 years ago. The record shows that defendant struck this person with a peremptory challenge and did not use all of the peremptory challenges allotted to him by the trial court. Defendant has failed to show that he was forced to accept a juror which he otherwise would have struck. Thus, defendant has failed to demonstrate unfair prejudice that would warrant a reversal. *People v. Foster* (1990), 195 Ill. App. 3d 926, 949, 552 N.E.2d 1112, 1128-29.

Defendant's reliance on *People v. Lockett* (1990), 196 Ill. App. 3d 981, 554 N.E.2d 566, is misplaced. The *Lockett* court held that a defendant did not waive his objection to the trial court's failure to dismiss for cause when the defendant did not strike the juror with a peremptory challenge. (*Lockett*, 196 Ill. App. 3d at 984, 554 N.E.2d at

568.) Here, regardless of waiver, defendant cannot demonstrate that he was unfairly prejudiced.

## VII

■ Defendant asserts that he was denied a fair trial due to improper treatment of the juror cards. Defendant claims that the juror cards were not numbered and called in sequence from the jury assembly room, in violation of the rules of the circuit court of Cook County. Defendant, however, has failed to indicate that he objected to the procedure during jury selection or in his post-trial motion. Thus, the argument is waived. See *People v. Harris* (1986), 146 Ill. App. 3d 632, 636, 497 N.E.2d 177, 179.

Even if defendant had preserved the issue, it should be noted that the two cases cited by defendant, *Taylor v. Louisiana* (1975), 419 U.S. 522, 42 L. Ed. 2d 690, 95 S. Ct. 692, and *Duren v. Missouri* (1979), 439 U.S. 357, 58 L. Ed. 2d 579, 99 S. Ct. 664, address the blanket exclusion of women from the jury selection process. Defendant has failed to identify any unfair exclusion of any group or individual in this case, let alone the sort of exclusions at issue in *Taylor* and *Duren*. Nor has plaintiff shown how the jury selection unfairly prejudiced his case.

## VIII

Defendant contends that the police lacked probable cause to arrest him. In this case, while defendant has shown that he moved to suppress statements he made to the police, defendant has not shown that he moved to quash his arrest for lack of probable cause. Consequently, the argument is waived. See *People v. Watkins* (1981), 98 Ill. App. 3d 889, 897, 424 N.E.2d 701, 707.

■ Even if defendant had preserved the issue for appeal, his argument fails to persuade for two reasons. First, defendant may not have been "arrested" when he accompanied the police to the station and was questioned in the interview room. Resolving this question would require an analysis of the intent of the police and the understanding of defendant at the time. (See, *e.g., People v. Johnson* (1989), 187 Ill. App. 3d 756, 769, 544 N.E.2d 392, 400.) Second, assuming *arguendo* that the first question could be resolved in defendant's favor, the question of whether the police had probable cause would remain. Whether probable cause exists in a given case depends on whether the totality of the circumstances would lead a reasonable person to believe that a crime was committed and defendant committed it. (See *People v. Mackey* (1990), 207 Ill. App. 3d 839, 857-58, 566

N.E.2d 449, 460.) Here, the police discovered a dead body with an address book and court records nearby. The record indicates that the book and records suggested that defendant may have been involved in the death. The investigation indicated that defendant was not the deceased. The police interviewed defendant's upstairs neighbor, who indicated that she heard a fight in defendant's apartment and later saw defendant and another man loading a seemingly unconscious third man into the rear of defendant's car and drive away. The police are entitled to rely on the neighbor's statement. (See *Johnson,* 187 Ill. App. 3d at 771, 544 N.E.2d at 401.) The case cited by defendant, *People v. Holveck* (1990), 141 Ill. 2d 84, 565 N.E.2d 919, involves a different set of circumstances altogether. Thus, defendant has failed to show that the police lacked probable cause.

## IX

Defendant contends that he was unable to comprehend the *Miranda* warnings the police read to him at the station because he is illiterate. In order for defendant to effectively waive his *Miranda* rights after being informed of them, the waiver must be knowing and voluntary. (*People v. Bernasco* (1990), 138 Ill. 2d 349, 357, 562 N.E.2d 958, 961.) The record shows that the trial court rejected defendant's argument in the course of denying defendant's motion to suppress statements. It is the function of this court to determine whether the trial court's ruling was against the manifest weight of the evidence. *People v. Redd* (1990), 135 Ill. 2d 252, 293, 553 N.E.2d 316, 333.

In this case, the record indicates that defendant was 32 years old at the time of Ortuno's death and had attended school through the second year of high school. Defendant contends that he is unable to read English or Spanish, but he admitted on the record that he can understand English. The record indicates that defendant was orally informed of his *Miranda* rights more than once and stated that he understood his rights. The record indicates that defendant's written statements were read to him. The record indicates that defendant signed the written statements and initialled various corrections.

Defendant testified that he did not understand his rights, but it is the function of the trial court to evaluate the credibility of the witnesses. (See *Redd,* 135 Ill. 2d at 295-96, 553 N.E.2d at 334-35.) The cases cited by defendant are distinguishable. For example, *Bernasco* (138 Ill. 2d at 349, 562 N.E.2d at 958), *People v. Redmon* (1984), 127 Ill. App. 3d 342, 468 N.E.2d 1310, and *People v. Devine* (1974), 17 Ill. App. 3d 1053, 309 N.E.2d 76, all involved young defendants with mental deficiencies. *People v. Turner* (1973), 56 Ill. 2d 201, 206-07,

306 N.E.2d 27, 30, also involved a defendant with a mental deficiency. While the presence of a mental problem is not determinative (see *People v. Hester* (1968), 39 Ill. 2d 489, 500, 237 N.E.2d 466, 474), it is a factor which defendant has not shown in this case. The trial court in *People v. Nau* (1988), 167 Ill. App. 3d 338, 345, 521 N.E.2d 177, 182, found that defendant was delusional at the time he gave a statement to the police; defendant has not pointed to such evidence here. Finally, in *People v. Araiza* (1974), 19 Ill. App. 3d 52, 55, 311 N.E.2d 190, 193, the trial court considered evidence of defendant's beer drinking and lack of sleep prior to giving the statement, along with defendant's *undisputed* inability to *speak* English. Again, defendant has presented no such evidence in this case. Thus, defendant has failed to show from the record that the trial court's ruling was against the manifest weight of the evidence.

## X

Defendant argues that the trial court erred by giving *Prim* instructions to the jury. Named after the case of *People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, their purpose is to assure that deadlocked jurors will examine their positions and attempt to reach a verdict. (See *People v. Bibbs* (1981), 101 Ill. App. 3d 892, 900, 428 N.E.2d 965, 971.) A reversal is warranted where the language of such an instruction unfairly interferes with or coerces the verdict. *People v. Craddock* (1987), 163 Ill. App. 3d 1039, 1045, 516 N.E.2d 1357, 1362.

Defendant has failed to show that he objected to the giving of the *Prim* instruction either at the time it was given or in his post-trial motion. Therefore, the argument is waived.

 Even if defendant had preserved the argument, it would fail to persuade this court. Defendant relies on *People v. Santiago* (1982), 108 Ill. App. 3d 787, 439 N.E.2d 984, to argue that the trial court improperly inquired into the numerical division of the jury. In *Santiago*, however, the trial court inquired not only into the numerical division of the jury, but also into which verdict the majority favored. (See *Santiago*, 108 Ill. App. 3d at 806-07, 439 N.E.2d at 997.) In this case, the trial court expressly told the jury foreman not to reveal which verdicts the majority favored. Thus, the inquiry was harmless. *Craddock*, 163 Ill. App. 3d at 1045-46, 516 N.E.2d at 1362.

Defendant also contends that the trial court coerced the verdict, given the *timing* of the *Prim* instruction. In his brief, defendant asserts that the jury was so instructed at 4:30 p.m. on a Friday and the jury returned its verdicts 15 minutes later. Defendant asserts that the jury must have feared being sequestered over the weekend.

Defendant relies on *People v. Ferro* (1990), 195 Ill. App. 3d 282, 551 N.E.2d 1378, *People v. Friedman* (1986), 144 Ill. App. 3d 895, 494 N.E.2d 760, *People v. Branch* (1984), 123 Ill. App. 3d 245, 462 N.E.2d 868, and *People v. Robertson* (1981), 92 Ill. App. 3d 806, 416 N.E.2d 323, in support of this argument. These cases are distinguishable in two important respects. First, in each case the trial court made remarks regarding sequestration or the impossibility of deadlock. In this case, defendant has not identified any such remarks in the record. Second, in each case the jury returned verdicts shortly after hearing the trial court's remarks. In this case, despite defendant's assertions, the half-sheet included in the record indicates that the jury was given the *Prim* instruction at 11:45 a.m. on May 12, 1989, and returned its verdicts at 3:45 p.m. that day. Defendant has not shown, as was the case in *Ferro* and *Santiago*, repeated interference by the trial court.

## XI

■■ Defendant contends that he was denied a fair trial due to improper contact with the jury. Defendant points to a discussion during his sentencing hearing indicating that defense counsel and the trial judge were aware that the jury had reached a verdict on the concealment charge prior to the conclusion of jury deliberations. However, defendant has not shown from the record that he raised the issue during jury deliberations or in his post-trial motion. Nor has defendant pointed to anything in the record which would indicate that such contact, if it occurred, was of the sort requiring this court to address the issue as plain error. Thus, the issue is waived.

## XII

■■ Finally, defendant contends that the trial court erred by refusing to rule on objections at trial, making statements such as, "the appellate court will decide that." Defendant, however, has failed to point to any such instance in the record and failed to raise the issue in his post-trial motion. Consequently, defendant has waived this issue.

For all of the aforementioned reasons, we affirm the judgment of the circuit court of Cook County.

Judgment affirmed.

O'CONNOR and MANNING, JJ., concur.